**Anthony BELCHER, et al., Plaintiffs,**

v.

**Leo E. MANSI, et al., Defendants.**

**Civ. A. No. 81–0115–S.**

United States District Court,
D. Rhode Island.

June 30, 1983.

Urso, Liguori & Urso by Thomas J. Liguori, Jr., M. Linda Urso, Westerly, R.I., for plaintiffs.

Palombo & Piccirilli by Vincent J. Piccirilli, Providence, R.I., for defendants.

OPINION AND ORDER

SELYA, District Judge.

This case presents an enigmatic question as to whether members of the public have either a federal constitutional right, guaranteed by the First Amendment, or a right under the Rhode Island Open Meetings Law, R.I.Gen.Laws (1976) § 42–46–1 *et seq.*

(the "Act"), to tape record a public meeting of a community school board.[1]

## I.

Plaintiffs, Anthony Belcher and Olga Brooks, are both teachers employed by the School Committee of the Town of Warren (the "Committee"). At the time this action was commenced Belcher was president of the Warren Education Association ("WEA"), the certified collective bargaining agent for all teachers employed by the Committee, and Brooks was chairperson of WEA's professional rights and responsibilities committee.[2] Defendants are the chairperson and members of the Committee.[3]

The present controversy took root on February 9, 1981. On that date, the Committee held a public meeting. Belcher was in attendance, with his trusty tape recorder. According to Wilfred R. Marchand (Superintendent of Schools for the Town of Warren), he was unaware that Belcher was taping the meeting until he heard a "clicking" noise. Marchand then saw the tape recorder and made inquiry of Belcher; Belcher replied: "I have a constitutional right to tape an open and public meeting."[4]

The minutes of the Committee's February 9 meeting indicate that, during the meeting, Marchand requested that the Committee consider adopting the following policy: "No electronic or mechanical device shall be used for the purpose of taping meetings of the Warren School Committee without the express knowledge and consent of said Warren School Committee." Plaintiffs' Exhibit 1 at 2. After some discussion, the Committee suggested that Marchand reword the proposed policy to make it clear that "anyone at the meeting who objected to being taped could voice their objection and the Committee could then rule to disallow the use of taping session(s)." Id. No vote was taken.

Following the inconclusive consideration of this proposed policy, the Committee turned, in the ordinary course of its business, to a grievance brought by the WEA regarding the appointment of a principal at a local school. Belcher "requested that the hearing be in open session and Mr. Nunes asked him if his tape recorder was on." Id. at 2. Belcher replied in the affirmative. Nunes then moved that the device be switched off. The motion passed. Belcher, undaunted, asked that he be allowed to record the prospective discussion, but permission was denied. The Committee then proceeded to the agenda item with Belcher's mechanical equipment shut down. It did not go into executive session for the grievance debate.

The minutes of the Committee's February 23, 1981 meeting (Plaintiffs' Exhibit 2) reflect adoption of the tape-recorder policy precisely as originally framed by Marchand at the February 9 session (see text, *ante*). According to Exhibit 2, Belcher then requested permission to tape that meeting. The Committee granted his request. Marchand and Belcher both testified that, since the adoption of the policy, Belcher has never been refused permission to record a Committee meeting.

---

1. The case was tried to the Court, sitting without a jury, in February 1983. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

2. Although defendants have not raised the issue, it is questionable whether Brooks has standing to raise plaintiffs' claims in this case. Belcher clearly has standing, however, so the court declines to decide Brooks' standing *sua sponte*.

3. When the complaint was filed, Leo E. Mansi (Chairman), Anthony N. Nunes, George E. Gempp, Jr., Leo P. Bouffard and Anthony Mo-

gayzel were named as defendants and sued individually and in their official capacities as Committee members. At trial, the parties stipulated to the substitution of current Committee members Robert J. Healey, Jr., John J. Killion and Paul E. Brule as parties defendant in lieu of Mansi, Nunes and Bouffard. In addition, the plaintiffs at that time abandoned pursuit of any claims against any of the defendants as individuals. Thus, the defendants now before the court are sued only in their official capacities.

4. Apparently, Belcher had attended the previous meeting of the Committee, held January 26, 1981. He tape-recorded that meeting without the Committee's permission or knowledge.

At trial, Marchand gave three reasons for the adoption of the tape recorder policy. First, the minutes as taken by the Committee's secretary and approved by the Committee constituted the official record of the meeting. By implication, no other record of Committee meetings was either necessary or desirable. Second, tapes of the meetings could conceivably be altered. Finally, members of the public who wanted to speak at the meeting would be intimidated or inhibited from doing so if a recording was being made. Under questioning by the court, Marchand admitted that neither he nor the Committee had promulgated any rules as to how the Committee was to be put on notice that an individual wished to tape record a meeting; nor had any standards been devised for determining when consent would or would not be granted.

Marchand further testified that the secretary to the Committee (who was also his personal secretary) customarily took notes at Committee meetings and prepared the minutes from those notes. At each meeting, the minutes from the previous session were reviewed by the Committee and additions or corrections were solicited. After the minutes were approved by the Committee, they were placed in bound volumes as permanent records. On occasion, a court reporter would be summoned to take a verbatim transcript of a particular hearing.

Finally, Marchand testified that no one other than Belcher had ever sought permission to record Committee meetings.

## II.

Plaintiffs claim that defendants violated rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, and by 42 U.S.C. § 1983, in several ways. They first argue that defendants' actions in refusing to allow Belcher to record a portion of the February 9, 1981 meeting abridged their rights "to freedom of speech, which includes freedom to receive information of a public nature, freedom of association, and freedom of the press." Complaint at ¶ 5. Second, plaintiffs contend that the Committee's edict, as adopted on February 23, 1981, is unconstitutional because "it was calculated to chill [plaintiffs] in the exercise of their protected rights to freedom of speech, freedom of association and freedom of the press." *Id.* at ¶ 11. Plaintiffs reason that, because the policy requires them to ask permission to tape record public Committee meetings, and because permission may be denied arbitrarily, defendants thereby impose a prior restraint on plaintiffs' exercise of their First Amendment rights. Further, plaintiffs contend that defendants violated the Act "by denying them access to the deliberations and decisions of the Warren School Committee which are required by law to be performed in an open and public manner." *Id.* at ¶ 8. In this context, it should be noted that the Act, specifically R.I.Gen. Laws § 42–46–3, mandates that the public be allowed to attend each and all of the Committee's meetings, except for those sessions dealing with a limited number of specified topics. *See* R.I.Gen.Laws § 42–46–5. Lastly, plaintiffs allege that the Committee's policy anent the taping of public meetings deprives them of their rights under the Equal Protection Clause of the Fourteenth Amendment since the regulation is bereft of any standards for determining when taping would or would not be allowed, thereby "permitting arbitrary and capricious action in the implementation of said policy." Complaint at ¶ 13. Plaintiffs seek declaratory and injunctive relief, attorneys' fees, costs and disbursements.

## A.

Plaintiffs' initial First Amendment claim is singular in that, rather than asserting the rights of a speaker, it asserts the rights of a listener to enhance his comprehension by means of the recording of a public meeting. The plaintiffs seek, in effect, to enrich the efficacy of the salubrious introduction of the public ear into the non-privileged, non-exempt dialectics of government. This contention presents intriguing questions grounded in the "right to know" and "right of access" protected by the First Amendment, *see, e.g., Globe Newspaper Co. v.*

*Superior Court for the County of Norfolk,* 457 U.S. 596, 604, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982); *Board of Education v. Pico,* 457 U.S. 853, 866, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435, 446–47 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 576, 100 S.Ct. 2814, 2827, 65 L.Ed.2d 973 (1980) (Burger, C.J.), and in the imperatives of the First Amendment as a tool for keeping public institutions accountable. *Globe Newspaper Co.,* 457 U.S. at 605–06, 102 S.Ct. at 2619–2620; Lewis, *A Public Right to Know About Public Institutions: The First Amendment As a Sword,* 1980 Sup.Ct.Rev. 1, 23 (1981).

The court need not resolve these arcane questions, however, as it concludes that resort to the Act will satisfy plaintiffs' initial claim. Consistent with the prudential guideline explicated by Justice Brandeis in *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 346–48, 56 S.Ct. 466, 480, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), and thereafter firmly embedded in our jurisprudence, *see, e.g., Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974); *In Re Justices of Supreme Court of Puerto Rico,* 695 F.2d 17, 22 (1st Cir.1982), this court must decide plaintiffs' claim upon available state statutory grounds to the extent dispositive.

The Act demands that all of the Committee's meetings be open to the public except when certain topics, not relevant here, are under discussion. *See* R.I.Gen.Laws §§ 42–46–3, 42–46–4 and 42–46–5. Significantly, the public policy of the Act, as articulated by the state legislature, provides:

> It is essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy.

R.I.Gen.Laws § 42–46–1.

Although there are no reported Rhode Island cases interpreting this provision of the statute, the plain language of the law itself betokens that two salient First Amendment values—the public's right to know and the accountability of public institutions—are at the core of the Act. Rhode Island's concern that Committee meetings be open to the public is unarguably to the end that the citizenry may be informed of the reasons underlying the Committee's decisions and aware of the effectiveness of Committee members. The Act having thus opened the Committee's meetings to the public, inquiry must follow as to whether the statutory command likewise requires the Committee to allow the tape recording of its public (non-executive, non-exempt) sessions. This court concludes that such an inquiry must be answered in the affirmative.

In the court's judgment, a determination that the Act requires the Committee to allow members of the press and public to tape record its meetings follows inexorably from the policy set forth at R.I.Gen.Laws § 42–46–1, previously quoted. By attending Committee meetings in person, individuals can hear and see for themselves the functioning and deliberations of their elected officials. But, while those in attendance may take notes of the discussions, or later refer to the official minutes, neither their notes nor the minutes will provide a complete record of the proceedings. Moreover, many persons who have an interest in the Committee's doings may be unable to attend the meetings: a tape would provide them with an accurate and complete record of the proceedings.

Similar reasoning has been relied upon by both the New Jersey and California courts in interpreting their respective open meeting statutes. In *Sudol v. Borough of North Arlington,* 137 N.J.Super. 149, 348 A.2d 216 (Ch.Div.1975), for example, it was held that a member of a citizens' group had the right, under the New Jersey open meeting law, to tape record proceedings of municipal council meetings. And, in *Nevens v. City of Chino,* 233 Cal.App.2d 775, 44 Cal.Rptr. 50 (D.Ct.App.1965), the court held that the California open meeting law gave an individual the right to tape record public meetings of a city council. *Cf. Maurice River Township Board of Education v. Maurice*

River Township Teachers Association, 187 N.J.Super. 566, 455 A.2d 563 (Ch.Div.1982) (giving members of a teachers' organization the right, under the state constitution, to videotape public meetings of the local school board).

Turning to the rationale proffered by the defendants for restricting the taping of public meetings, the court cannot discern that any compelling governmental interest has been demonstrated, see Globe Newspaper Co., 457 U.S. at 607, 102 S.Ct. at 2620, nor even that any rational basis exists for the ban. In this respect, the court will examine the Marchand trilogy of reasons (summarized above) seriatim.

First, the keeping of an official record of the meeting by the Committee does not mean that unofficial records cannot and should not be kept.[5] There is no evidence that informal records could or would be confused with official ones, and common sense argues strongly to the contrary. Moreover, the official records here in question—the Committee minutes—are summary in nature and do not, in any way, constitute a complete report of the proceedings. Thus, unofficial records may well be invaluable if the public is to taste the full flavor of the proceedings.

Second, defendants argue that tapes of the meeting could be altered. That is true, yet the official minutes are, given their recapitulative format, equally subject to alteration with scant chance of detection: comments or discussions could easily be skewed by omission, revision or deletion at a variety of points prior to passage of the Committee vote approving the minutes. Minutes which purport to abridge and to summarize what went before at best involve a process of subjective judgment calls; and may well, by inadvertence or by

design, lead to a finished product which bears only a distant resemblance to the original. A tape recording of the meeting could therefore act as an insurance policy against imperfections in the official record.

Moreover, since the recordings here at issue would be nonofficial only, even the most stealthy chicanery in tampering with the tapes would not cause the ship of state to founder. The defendants' argument on this point assumes a level of civic gullibility which demeans their constituency: if the public has a right to know, then the public must be trusted to exhibit some degree of discernment in sorting out the fruits of knowledge so acquired.

Finally, the Committee urges that members of the public might be loathe to speak at open meetings if tape recording was in progress. While preserving public participation in certain facets of the Committee's meetings is an important consideration, defendants' assertion has no factual support on the record and is belied by common sense. If an individual is willing to stand up and talk in the sometimes volatile setting of a thronged public meeting, at which members of the press are customarily present, that person has little to fear (and much to gain) from the presence of a tape recorder. In any event, the argument, even if it has some marginal value, will not be allowed to defeat the salutary ends which are served by allowing Committee meetings to be taped, at least without convincing evidence to support the proposition.[6]

In the case at bar, the defendants have presented no rational basis for any compelling governmental interest which would sustain the instant prohibition against the

---

5. Defendants would surely not insist that a newspaper must base its report of Committee meetings solely on the official minutes, yet that mode of practice would follow logically from defendants' asservation. As the press is a representative of the public and does not have a monopoly either on the First Amendment or on the ability to enlighten, First National Bank of Boston v. Bellotti, 435 U.S. 765, 782, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978), the same

rights and privileges must be accorded to members of the public.

6. Cf. Chandler v. Florida, 449 U.S. 560, 575, 101 S.Ct. 802, 810, 66 L.Ed.2d 740 (1981), rejecting the proposition that the very presence of media cameras and recording devices at a trial inescapably gives rise to an adverse psychological impact on the participants in a trial.

**384**

tape-recording of public meetings in the face of a challenge under the Act.[7]

This is not to say that every citizen armed with a recording device must be granted carte blanche in all events and under all circumstances. There may well be reasonable restrictions which could lawfully be imposed, e.g., those designed (i) to preserve the orderly conduct of a meeting by controlling noise levels, spatial requirements and the like, or (ii) to safeguard public facilities against damage by the use of equipment unsuited to the meeting hall's electrical system, or (iii) to require fair payment by the wielder of the device for electricity used.[8] Likewise, the court does not hold that the defendants must provide the means for permitting such recordation; if the meeting is held in an alfresco setting, for example, the absence of electrical service should not, without more, implicate its legality.[9] In the usual case, the onus should be on the citizen to provide equipment suitable to his intended purpose. Succinctly stated, the court's opinion interdicts, under the Act, only the particular policy adopted by the Committee in the light of a trial record barren of justification for such an astrictive rule.

B.

Although the court, in consequence of the above, has no need to pass on whether or not the First Amendment requires the Committee to allow the taping of its public meetings, plaintiffs make two additional constitutional arguments which must be addressed. Plaintiffs allege that the Committee's policy, which allows the taping of public meetings only by grace of the Committee, constitutes (i) a prior restraint on plaintiffs' First Amendment rights; and (ii) a violation of the Equal Protection clause of the Fourteenth Amendment, in that the policy provides no standards by which the Committee is to decide whether or not to allow the taping of a meeting.

As previously discussed, the court has not found it essential to decide if plaintiffs have a First Amendment right to tape record public meetings, for the Act gives an equivalent right to these plaintiffs. Because the Rhode Island statute is premised on the First Amendment values of an informed public and the accountability of public institutions, however, the court concludes that certain constitutional principles should apply to the regulation of the right to tape record open, public meetings. Moreover, since the Committee did adopt a policy allowing its public meetings to be taped, it thereby created a right: having done so, the Committee "assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Widmar v. Vincent,* 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981). *See Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972); *Sherrill v. Knight,* 569 F.2d 124, 129 (D.C. Cir.1977); *Princeton Education Association v. Princeton Board of Education,* 480 F.Supp. 962, 968 (S.D.Ohio 1979).

One of the mainstays of this bundle of constitutional norms is the principle that any regulation of First Amendment rights must be precisely and narrowly drawn to vindicate the sovereign's interest. *Cox v. Louisiana,* 379 U.S. 536, 556–58, 85 S.Ct. 453, 465–466, 13 L.Ed.2d 471 (1965); *Unemployed Workers Union v. Hackett,* 332 F.Supp. 1372, 1377 (D.R.I.1971). In enforcing this tenet, the Supreme Court has routinely guillotined statutes which afford

---

**7.** The court does not suggest that the Act would require the Committee to allow executive sessions to be recorded. That issue is not before the court and the relevant considerations seem, at first blush, to be quite different. For these reasons, the case of *Dean v. Guste,* 414 So.2d 862 (La.Ct.App.1982), relied on by defendants, is inapposite.

**8.** The listing is not intended to be all-inclusive, but is inserted for illustrative purposes only.

**9.** If, however, the decision as to the meeting place was made on the basis that this would thwart recording efforts, a different result might well ensue. *Cf. Board of Education v. Pico,* 457 U.S. at 866, 102 S.Ct. at 2808, 73 L.Ed.2d at 446–47, where the Supreme Court held that defendants could not lawfully block students from receiving ideas simply by removing certain books from the school library.

public officials unfettered discretion to determine what expressions of points of view will or will not be permitted. *Cox v. Louisiana,* 379 U.S. at 557, 85 S.Ct. at 465. Such broad discretion panders to suppression of the communication of ideas and permits a public functionary to act as a censor. *Id.* If officials were to grant or deny indulgences on the basis of the content of the speech (or in this case, the content of the listening), they would undermine the nation's commitment to the " 'equality of status in the field of ideas.' " *Police Department of the City of Chicago v. Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290, *quoting* A. Meiklejohn, *Political Freedom: The Constitutional Powers of the People* 27 (1948). Such content-based regulation requires the most exacting scrutiny. *Perry Education Association v. Perry Local Educators' Association,* —— U.S. ——, ——, 103 S.Ct. 948, 953–957, 74 L.Ed.2d 794 (1983); *Widmar v. Vincent,* 454 U.S. at 276, 102 S.Ct. at 277–278; *Carey v. Brown,* 447 U.S. 455, 462–63, 100 S.Ct. 2286, 2291, 65 L.Ed.2d 263 (1980); *Police Department of the City of Chicago v. Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290.

Another vice inherent in the Committee's policy is the obvious danger to the rights of a person or group to obtain equal protection of the laws. *Cox v. Louisiana,* 379 U.S. at 557, 85 S.Ct. at 465. Under the Equal Protection Clause, as well as under the First Amendment, " 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.' " *Carey v. Brown,* 447 U.S. at 455, 100 S.Ct. at 2286–87; *Police Department of the City of Chicago v. Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290.

The policy promulgated in Warren cedes unbridled discretion to Committee members to decide whether leave to record public meetings will be granted. Under the policy, Committee members could refuse permission to tape record a public meeting based on the subject to be discussed or the person making the request. Nothing contained in the rule itself would, for instance, debar the Committee from letting all registered Democrats electronically chronicle ongoing proceedings to their heart's content while prohibiting all registered Republicans from doing so. Indeed, in this case plaintiff Belcher sought permission to record discussions of a WEA grievance, and permission was refused; that rejection stands as a classic example of content-based censorship through the enforcement of a policy giving public officials plenary power to determine the speech to which plaintiffs could listen electronically. That the Committee did not think the issue justified an executive session under R.I.Gen.Laws § 42–46–5 indicates unmistakably that there was no compelling interest for such mulish reticency when confronted with Belcher's request. On the facts of this case, the Committee's refusal can be labeled accurately as a species of viewpoint-based discrimination. *See City of Madison Joint School District v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 175–76, 97 S.Ct. 421, 426–27, 50 L.Ed.2d 376 (1976).

As is clear from the evidence, the Committee's policy runs afoul of the principle that statutes regulating First Amendment rights must be drawn meticulously in order to minimize the risk of impermissible content regulation. *Police Department of the City of Chicago v. Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290. Further, the regulation also allows the Committee to deny the right to tape record based on the outlook of the person requesting permission to do so, thereby violating the Equal Protection Clause as well as the First Amendment. *Carey v. Brown,* 447 U.S. at 455, 100 S.Ct. at 2286–87.

### III.

While the vice practiced by the defendants in the case at bar seems somewhat mild, vigilance in the assiduous protection of the rights of citizens is necessary in response to any unwarranted decurtation of those rights—mild or odious. So here: if the public's twin rights, to know and to expect that the institutions of government will be accountable, are to be safeguarded, they deserve to be protected against all

impermissible incursions as devastation can result as effectively from the combined effect of multiple pinholes in the dike as from the blasting of a single major cavity.

The plaintiffs are entitled to declaratory and injunctive relief consonant with the teachings of this opinion, and to counsel fees and costs.[10] Counsel for the plaintiffs shall prepare and present an order for judgment in accordance herewith.

It is so ordered.

10. Despite the fact that the principal issue in this controversy has been decided on state statutory grounds, it is plainly enmeshed with the federal constitutional claims, as all claims arise out of a common nucleus of operative facts. Attorneys' fees are therefore in order under 42 U.S.C. § 1988. *Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir.1978). Counsel for the plaintiffs shall file their application for fees within ten days of the date hereof, in proper detail and with the requisite supporting documentation; and the defendants shall have ten days next following to respond thereto.