Reverend Bernard DUFFY and Irwin
Becker, Plaintiffs,

v.

Rocco A. QUATTROCCHI, et
al., Defendants.

C.A. No. 79–0645 S.

United States District Court,
D. Rhode Island.

Dec. 5, 1983.

O'Brien & Newton by Mortimer C. Newton, Providence, R.I., for plaintiffs.

Dennis J. Roberts II, Atty. Gen. by Alan R. Tate, Asst. Atty. Gen., Joseph Dugan, Sp. Asst. Atty. Gen., Providence, R.I., for defendants.

## OPINION AND ORDER

SELYA, District Judge.

### I.

This action was instituted on December 7, 1979 by the plaintiffs, Bernard Duffy and Irwin Becker, against some fourteen members of the Rhode Island State Senate and against Captain John R. Devine, an officer of the Rhode Island State Police. Jurisdiction is premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).

In essence, the suit challenges the validity of an edict informally promulgated by three members of the leadership of the state senate barring the presence of signage at a legislative public hearing held on May 3, 1979. In their complaint, the plaintiffs prayed for certification of a class comprised of all Rhode Island registered voters; and sought declaratory and injunctive redress, money damages, counsel fees and costs. The gravamen of the action has at all times been the contention that the *ad hoc* rule abridged the rights of citizens, including the plaintiffs, under the First and Fourteenth Amendments to the United States Constitution.

The procedural posture of the case has, however, changed markedly since its inception. On January 15, 1980 all of the defendants, save only Devine, moved for dismissal of the action on the ground of legislative immunity. The plaintiffs did not object. Accordingly, in pursuance of Local Rule 12(a)(2) of this court, the motion was granted on February 1, 1980. Devine, then and now the sole defendant remaining before the court, answered the complaint. After other proceedings not relevant for purposes of this opinion, Devine moved under Fed.R.Civ.P. 56 for partial summary judgment. That motion was eventually withdrawn at a chambers conference on June 29, 1983, and trial by jury was waived at the same time. *See* footnote consent order dated June 29, 1983 (the "June 29 Order"). The parties agreed in principle on that date to submit the cause for decision on the basis of the facts as revealed by numerous depositions. A briefing schedule was established.

On August 10, 1983, well into the briefing schedule and more than three and one-half years after suit was brought, Duffy and Becker for the first time moved to secure certification of the class. No explanation was proffered for the lengthy delay. Devine objected. On September 13, 1983, the court, in a memorandum order, denied the motion on the ground, *inter alia*, that it had been presented substantially out of time. *See* Local Rule 30(c). The briefing schedule ran its course, and a hearing was held on November 18, 1983.

At that time, the court, noting that the plaintiffs' written submissions had addressed themselves exclusively to the claims for declaratory and injunctive relief, put squarely to counsel the question of the status of the original prayer for monetary redress. Counsel stated unequivocally that the claim for money damages was waived, and that the plaintiffs, presently, sought only a declaration of rights, a restraining order prohibiting future enforcement of the

*ad hoc* rule, and ancillary relief in the nature of attorneys' fees and costs. *See* 42 U.S.C. § 1988. The court thereupon proceeded to raise, *sua sponte*, considerations of mootness; and, at the conclusion of the hearing, the parties were accorded the right to submit supplemental memoranda. These having been filed, the cause is now in order for decision.

## II.

The 1979 session of the Rhode Island General Assembly devoted substantial time to the consideration of consumer-oriented legislation—an agenda which attracted a rather passionate constituency. The testimony reflects that the session was marked by picketing, sit-ins and kindred activity. On upwards of five occasions during the first four months of the year, state police were summoned to the State House to maintain crowd control. As April wound to a close, the state senate was on the verge of taking up seven of these consumer proposals. There is evidence that, at previous hearings held on some of these very bills in the house of representatives, crowds had materialized and boisterous conduct had ensued.

Inasmuch as the legislative session was drawing to a close,[1] and the seven bills in question were before three disparate senate committees (Finance, Corporations, Judiciary), the senate leadership opted to hold an agglomerate public hearing anent the proposed legislation. Because of the large number of people expected to attend, the Bishop McVinney Auditorium was leased from the Diocese of Providence for this purpose. This facility, located in relatively close proximity to the State House, affords comfortable spectator seating for a minimum of seven hundred fifty adults; it had been used by the General Assembly in the past under comparable circumstances. May 3, 1979 was the date designated for the public hearing.

---

**1.** The Rhode Island General Assembly is not a full-time or year-round body; historically, it convenes each January and, absent the calling of a special session, usually concludes its annual business sometime in the month of May.

The chairmen of the three affected senate committees, Senators Castro, McKenna and Quattrocchi, met in late April of 1979, acting as an *ad hoc* rules committee. Quattrocchi was, at the time, not only the chair of the Judiciary Committee, but was the incumbent senate majority leader; as such, he was *de facto* the senate's most powerful figure.[2] This threesome arranged for security to be furnished by the state police and decided, *inter alia,* to exclude all posters and signs from the upcoming hearing. The ban was, in effect, affirmed during the opening minutes of the May 3 hearing by a vote of the senators there in attendance.

Approximately three hundred people attended the hearing, including some twenty-five members of the General Assembly. The latter were seated on a stage facing the audience. A podium, equipped with a microphone, was set up in the amphitheater to permit attendees to address the assembled public officials. An individual could take advantage of that opportunity by submitting his/her name to one of the senate clerks stationed in the lobby. Plaintiff Duffy complied with this procedure and was allowed to express his views on the proposed legislation in this fashion.

After he had testified, Duffy left the hall. He thereafter attempted to re-enter several times with posters in hand, but was prohibited from doing so by defendant Devine. Duffy was ultimately arrested and charged with obstructing a police officer during the course of his duty and with assaulting a police officer. In a subsequent jury trial, Duffy was convicted of the former charge, but acquitted of the assault. The conviction was affirmed on appeal. *See State v. Duffy,* 441 A.2d 524 (R.I.1982). A state trooper, unidentified on this record, also stopped plaintiff Becker when he tried to enter the hearing room with signage in tow. The record is barren of any evidence that the procedures which were employed at the May 3, 1979 hearing have been enforced—before or since—by the state senate or by any of its committees. And, Senator Castro testified in his deposition that the proscription against signs was an idiosyncratic response to the perceived problems ancillary to the May 3, 1979 hearing.

### III.

■ The First and Fourteenth Amendments guarantee that no state may abridge freedom of speech. These amendments remove "governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity...." *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 *reh'g denied,* 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124 (1971). It is well settled, however, that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any conceivable manner. *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981); *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976); *Adderley v. Florida,* 385 U.S. 39, 47–48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966), *reh'g denied,* 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed.2d 559 (1967). In that the auditorium was, on May 3, 1979, plainly a public forum,[3] *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963), the state

---

**2.** The Democratic party enjoyed, at the time, a 45-to-5 margin in that chamber.

**3.** By establishing an alternative forum for activities which would in the usual course have taken place at the State House, and by opening the site for direct citizen involvement in the debate over contemplated legislation, the auditorium undeniably became, for First Amendment purposes, a public forum for the time being. *See* *Widmar v. Vincent,* 454 U.S. 263, 267–68, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981); *Madison Joint School District v. Wisconsin Public Employment Relations Commission,* 429 U.S. 167, 175–76, 97 S.Ct. 421, 426–427, 50 L.Ed.2d 376 (1976); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975).

could enforce reasonable time, place, and manner regulations on expressive conduct as long as the restrictions were "content-neutral, ... narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *United States v. Grace,* — U.S. ——, ——, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736. (1983) (quoting *Perry Education Association v. Perry Local Educators' Association,* — U.S. ——, ——, 103 S.Ct. 948, 953, 74 L.Ed.2d 794 (1983)).

The plaintiffs seek, in effect, to have this court apply the *Grace* yardstick to ascertain the vitality of the *ad hoc* regulation in the face of a First Amendment challenge.

### IV.

■ The law is clear, however, that in order to declare the rights of any individual, a federal court must be vested with jurisdiction over the subject matter of the suit and may only pass upon concrete "cases or controversies" properly before it. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); *United States Parole Commission v. Geraghty,* 445 U.S. 388, 395, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). Furthermore, the court must determine whether such jurisdiction exists even if the issue is not raised by any party to the litigation. *Escobedo v. Estelle,* 655 F.2d 613, 614 (5th Cir.1981). One of the critical prerequisites to a finding of justiciability is that there be a viable controversy presently before the court. *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). And, the absence of a zoetic dispute ineluctably gives rise to mootness. The First Circuit recently described the doctrine of mootness in the following manner:

> [J]urisdiction, properly acquired, may abate if the case becomes moot because

(1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

*Loeterman v. Brookline,* 709 F.2d 116, 118 (1st Cir.1983) (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). It is clear beyond peradventure that this tenet applies with the same force to requests for declaratory judgment as it does to claims seeking injunctive relief. *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969); *Vorbeck v. Schnicker,* 660 F.2d 1260, 1265 (8th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982).

■ In the case at bar, Duffy and Becker seek a declaration that Devine's enforcement of the *ad hoc* decree prohibiting signs and posters within the confines of McVinney Auditorium on May 3, 1979 violated their First and Fourteenth Amendment rights. Nothing before the court at the present time, however, indicates that there is any "reasonable expectation ... that the alleged violation will recur." *Loeterman v. Brookline,* 709 F.2d at 118. The deposition testimony contains not the slightest hint that the *ad hoc* rule was intended to be, or actually continued to be, in force on any occasion other than as a ground rule for the May 3 public hearing. And, the record is similarly bereft of any evidence that Devine—the sole defendant presently before the court—prohibited either or both of the plaintiffs (or any other person, for that matter) from transporting signage into a legislative hearing at any time apart from his confrontation with Duffy on May 3, 1979.[4]

■ In their supplementary memorandum, the plaintiffs offer a trio of arguments in an effort to forestall application of the mootness doctrine. First, Duffy and Becker point to a stipulation reportedly en-

---

4. Inasmuch as Devine is sued individually, and not in a representative capacity, such continuing involvement in the enforcement of an inter-

dicted policy would appear to be a necessary prerequisite to the maintenance of the action in its present form.

tered into by the parties in connection with Devine's motion for partial summary judgment. According to plaintiffs' supplementary memorandum, that stipulation contained various fact agreements. One of these is alleged to have arguable relevance on this issue. It reads as follows:

> Since 1979, plaintiff Becker has attempted to bring signs and posters into public hearings called by the General Assembly to elicit public opinion on pending legislation. He has not been allowed to bring signs and posters into the hearings.

These two sentences, plaintiffs reason, cure any defect as to the continuing vitality of the controversy.

There are, however, several gaps in this chain of logic, any one of which would be sufficient to negate the plaintiffs' contention. The so-called stipulation does not appear of record here. While the court does not question counsel's good faith, and assumes *arguendo* that the stipulation was indeed entered into, the plaintiffs concede that the document was negotiated and drawn ancillary to the motion for partial summary judgment. That motion was, as indicated above, ultimately withdrawn. *See* June 29 Order. The most plausible explanation for the non-filing of the stipulation is that it became superfluous when the underlying motion was withdrawn. In any event, it was never made a part of the record and cannot now be given force and effect. *Cf. United States v. Kobrosky*, 711 F.2d 449, 457 (1st Cir.1983) (record on appeal).

Moreover, even if the stipulation was properly before the court, it would not cut this particular mustard. There is no suggestion as to how long the alleged proscription endured, nor, more importantly, any basis to conclude that the ban still persists. Indeed, there is nothing to suggest that senate hearings were involved, or that the *ad hoc* rule complained of lay at the heart of Becker's alleged subsequent rejection(s). Further, there is not a whisper of an intimation that Devine was in any way instrumental in repulsing Becker's supposed continuing efforts.

■ Last but surely not least, it is blackletter law that litigants cannot confer jurisdiction on a federal court by their agreement alone. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); *California v. LaRue*, 409 U.S. 109, 112 n. 3, 93 S.Ct. 390, 394 n. 3, 34 L.Ed.2d 342 (1972), *reh'g denied*, 410 U.S. 948, 93 S.Ct. 1351, 35 L.Ed.2d 615 (1973); *Reale International, Inc. v. Federal Republic of Nigeria*, 647 F.2d 330, 331 (2nd Cir.1981). And, since perscrutation of the record from the perspective of mootness raises a *jurisdictional* question, *Loeterman*, 709 F.2d at 118, this point of law applies squarely in the case at bar, inasmuch as none of the testimony in the cause affords any factual predicate whatever for the stipulated language. Thus, it is apparent that the plaintiffs cannot defeat an otherwise-compelling mootness analysis by adverting to the stipulation.

■ Duffy and Becker next argue that, even without proof of injury, their action is not stale and is still maintainable with respect to the deprivation of their rights on May 3, 1979. They essay that, if they can show the requisite abridgement of constitutional rights, they are entitled to nominal damages; and therefore, the case is not academic. The plaintiffs rely in this respect on *Carey v. Piphus*, 435 U.S. 247, 267, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978) and *Magnett v. Pelletier*, 488 F.2d 33, 34 (1st Cir.1973). But, this reliance is misplaced. While *Carey* and *Magnett* both hold that the demonstrated invasion of a constitutionally-protected right can, indeed, support an award of nominal damages even where proof of actual injury is lacking, they go no further. Plaintiffs' contention thus totally overlooks the waiver of their claim for money damages—a waiver which contained no reservation of a right to secure nominal damages. And, like Gertrude Stein's storied rose, a waiver is a waiver is a waiver. *See Alaska Airlines v. United States*, 399 F.Supp. 906, 910 (N.D.Cal.1975) (waiver is an *"abandonment* of a right,

with no reservations for future use..." ) (emphasis in original).

 Moreover, even if the waiver did not foreclose nominal damages, the fat would still be in the mootness fire. True, the existence of a viable and substantial damage claim can breathe life into an otherwise morbose request for declaratory or injunctive relief. *See, e.g., Powell v. McCormack,* 395 U.S. at 498, 89 S.Ct. at 1951; *Eckl v. Boston,* 476 F.Supp. 1014, 1017 (D.Mass.1979). But, these plaintiffs have come forward with no evidence of actual damage arising from the purported § 1983 violation, and have conceded, both by the waiver and in their briefs, that no such damage can be proven. Consequently, if they were to prevail on the merits, and if the waiver was to be ignored, they would at most be entitled to nominal damages. *See Carey,* 435 U.S. at 262–64, 98 S.Ct. at 1051–1052. And, where the inquiry is mootness *vel non,* the possibility of an award of nominal damages will not keep an otherwise deflated claim afloat. *Geraci v. Treuchtlinger,* 487 F.2d 590, 592 (2nd Cir.1973); *Kerrigan v. Boucher,* 450 F.2d 487, 489–90 (2nd Cir.1971); *see also Parks v. "Mr. Ford,"* 386 F.Supp. 1251, 1257 n. 11 (E.D.Pa.1974), *reversed in part on other grounds and remanded,* 556 F.2d 132 (3rd Cir.1977). So, this asseveration, too, collapses of its own weight.

 The plaintiffs' final thrust is a broader one, pitched on policy considerations and on the public interest. The plaintiffs argue, in effect, that if such a harsh rule could once be implemented, it is plausible that the state senate will again indulge itself, should the opportunity arise; and further, that "there is a major public interest in having the legality of the practice settled ... [since] ...—this kind of proscribed activity strikes at the heart of the democratic process." Plaintiffs' Supplementary Memorandum at 5–6. To some extent, this sort of reasoning stands logic on its head: while enlightened public interest may from time to time stir speculation as to abstract or hypothetical propositions, the courts cannot be placed in a position of issuing what would amount to advisory opinions whenever a citizen's curiosity has been piqued. The plaintiffs' pruritis cannot be scratched by the federal judiciary in the absence of a live controversy. Nevertheless, the court treats this argument as representing, at bottom, a plea that there is either some reasonable basis to predict that the alleged abridgement will recur or that interim events have failed completely to erase the effects of the putative violation.

This entreaty, while couched in perfervid rhetoric, need not long detain the court. The *ad hoc* rule has all the trappings of an aberrant reaction: it was conceived by a tiny leadership cabal in the wake of earlier events which disrupted the accustomed tranquility of the purlieus of the General Assembly; it was never reduced to written form; it was conceived for use in an unusual forum (it being rare that multiple major committees of the state senate collectively conduct a public hearing); it was never adopted by the state senate as a whole; and as noted earlier, there is a dearth of evidence that the *ad hoc* rule was ever designed to be, or actually continued to be, enforced after its debut on May 3, 1979.

Interim events, too, are strongly indicative of mootness. Since the May 3 hearing two general elections have intervened (November, 1980 and June, 1983).[5] In that time, the composition of both the state senate and of its leadership has been radically revamped.[6] Sweeping changes have been made in the senate rules. The court, pursuant to Fed.R.Evid. 201, has taken judicial notice of the rules currently in effect

---

5. The election for state senate which normally would have been held in November, 1982 was deferred by order of a three-judge federal court, *Farnum v. Burns,* 548 F.Supp. 769, 775 (D.R.I. 1982), and was eventually held, pursuant to order of the *Farnum* court, on June 21, 1983. *See Farnum v. Burns,* 561 F.Supp. 83 (D.R.I.1983).

6. The incumbent state senate comprises 21 Republicans and 29 Democrats. And, few of the leadership positions (including committee chairmanships) are occupied by the same individuals. Castro, for example, is no longer a senator; and Quattrocchi is neither majority leader nor a committee chair. Fewer than half of the four-

(S.Res. 469, '83–S 2000, adopted Sept. 13, 1983) and has compared them to the predecessor rules.[7] Such a review reveals a marked trend towards increased openness in the affairs of the senate.[8] Perhaps most germane to this case, the new rules add a specific proviso dealing with public hearings—a subject left in limbo by the former rules. The text of this rule is set out in the margin.[9] The existence of a particularized senate rule governing the conduct of public hearings (albeit one which does not deal directly with the question of signage), combined with the stated purpose of such hearings to "solicit the comments of the public" and with the earlier reference to the Open Meetings Law,[10] bodes well for the expectation that the exclusionary conduct of May 3, 1979 would not likely be condoned in 1983 by the state senate.

Viewed in this light, the court can say with considerable assurance that there is no reasonable basis to presume that the

actions complained of by these plaintiffs will recur;[11] and that, if such a possibility of recurrence did exist in earlier regimes, subsequent events have both nullified that threat and irrevocably erased the vestiges of the allegedly discriminatory conduct.

### V.

 Nor does this case fall within the narrow exception to the mootness doctrine, namely, that a dispute is "capable of repetition, yet evading review," since there is not a "reasonable expectation that ... [the plaintiffs] would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam); *Illsley v. United States Parole & Probation Department,* 636 F.2d 1, 2 (1st Cir.1980) (per curiam); *cert. denied,* 450 U.S. 1032, 101 S.Ct. 1744, 68 L.Ed.2d 228 (1981). And, this reasoning applies with especial force where, as here, there is no foundation for any assumption

teen senators originally named as defendants are still in office.

**7.** The court has reviewed the senate rules for both the 1979–80 session and the 1981–82 session. Those rules are virtually identical, each with the other.

**8.** By way of illustration, the current rules provide for such innovations as mandatory evening sessions (Rule 3.6), the printing of committee amendments (Rule 4.11–2), and the opening of committee records to the public (Rule 6.14). The principles of the state's Open Meetings Law, R.I.Gen. Laws 42–46–1 *et seq.,* have for the first time been accorded specific mention in the rules (*e.g.,* Rule 6.4–2).

**9.** Senate Rule 6.4–3 provides in its entirety:
Upon the written request of the prime sponsor of any public bill made prior to March 9, 1984, that a public hearing be held with respect to such bill, the committee chair shall schedule a public hearing within eight (8) days of such request unless a later date is agreed to by the prime sponsor. The committee chair may consider hearings on related matters. In the discretion of the chair, public hearings may be advertised in newspapers, stenographic records kept and hearings held at locations other than the state house. The purpose of the public hearing shall be to solicit the comments of the public on the matter being considered. At the public hearing all persons shall be permitted to testify; provided, however, the committee chair may limit

the amount of time allotted to speakers except that the prime sponsor shall not have a time limit to speak and shall upon request be the first speaker at the hearing. After the public hearing has been held for a reasonable period and if there are still persons wishing to speak, the committee chair may continue the hearing until another date. The committee shall not be required to conduct any votes at a public hearing.

**10.** The Open Meetings Law, given its objectives, is plainly designed to make governmental processes more responsive. The public policy of that Act is articulated in R.I.Gen. Laws § 42–46–1:
It is essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy.
While the statute does not deal squarely with expressive comment by way of signage, it has a reach beyond its literal commands. *Cf. Belcher v. Mansi,* 569 F.Supp. 379, 381–84 (D.R.I.1983) (Open Meetings Law requires school board to allow tape-recording of public non-exempt sessions).

**11.** And there is, of course, even less reason to prophesy that this particular defendant would in any way be involved in any such reenactment.

that the named defendant would, even if the unthinkable occurred, be the perpetrator. The plaintiffs can, of course, seek no refuge in the class-action allegations of their complaint, in the absence of class certification. *Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975); *Arnold v. Panora*, 593 F.2d 161, 164 (1st Cir.1979). And, in any event, any repetition of the conduct could, either by a timely effort to obtain injunctive relief or by a live suit for money damages, efficaciously be subjected to contemporaneous judicial oversight.

### VI.

For these reasons, the court must decline to adjudicate the substantive merits of the plaintiffs' complaint against Devine, and must dismiss the instant action, in its present posture, as moot.

*It is so ordered.*