DECISION
After a twelve-day bench trial in this Open Meetings Act violation case, the Court finds the facts and concludes of law as follows. In rendering this decision, the Court considered all of the trial evidence. However, the Court's review of that evidence, as laid out herein, is not intended to be exhaustive. Where the Court notes that it finds a matter to be true or factual, or when it notes that it accepted some testimony as true or factual, this should be taken to mean that the Court finds that matter proven as fact.
The standard of proof applied by the Court to the trial evidence is that of a preponderance of the evidence. With respect to the Court's factual findings, it should be taken as implicit that such matters have been proven by a preponderance of the evidence and so proven based on the Court's consideration of the trial evidence, including the credibility of the witnesses. The Court has considered the evidence in light of its own experience and observations in the affairs of life-as it is compelled to do in its role as fact finder.
 I. The plaintiffs' claims.
It is the plaintiffs' contention that the Rhode Island Lottery Commission meeting of March 25, 1996, was not convened in accord with the requirements of the Open Meetings Act. The plaintiffs also contend that the Commission or its members violated the Act when the Commissioners engaged in deliberations concerning Lottery business through the use of one or more clandestine communications intended to violate the spirit and requirements of the Act. The latter is a departure from the plaintiffs' earlier contentions that a meeting between the Commissioners' appointing authorities amounted to a de facto meeting of the Commission itself that was subject to the requirements of the Act. The plaintiffs contend now that Edward Moribito, Governor Lincoln Almond's former chief of staff, acted as a conduit for the now-deceased Donald Wyatt. The plaintiffs contend that the spirit and intent of the Act were violated through the use of a series of informal and surreptitious gatherings of less than all of the Commissioners and through the use clandestine communications.
 II. The Open Meetings Act.
The applicable Open Meetings Act is found at chapter 46 of title 42 of the General Laws. The parties do not dispute that the Court should apply the substantive provisions of the Act that were in effect in March 1996. Unless otherwise indicated in this decision, the Court's references are to the 1988 reenactment, which provides the relevant law.
The public policy behind the Act is clearly laid out at G.L. 1956 § 42-46-1. The policy states that it is "essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy." In Belcher v. Mansi,569 F. Supp. 379, 382 (D.R.I. 1983), the Federal District Court held that the Act is premised on the First Amendment values of an informed public and the accountability of public institutions.
Against the backdrop of the clearly stated public policy, the Act requires that every meeting of all public bodies shall be open to the public. G.L. 1956 § 42-46-3. The Act contains a number of technical requirements designed to ensure that the meetings of public bodies will remain open to the public, the violation of which is actionable under its remedial provisions. G.L. 1956 § 42-46-8. The Act also contains provisions specifically prohibiting meetings between members of public bodies where those meetings are used to circumvent its spirit and technical requirements, G.L. 1956 § 42-46-5(b), and specifically prohibits use of the Act's emergency notice provisions from being used in circumvention of the spirit and requirements of the chapter, G.L. 1956 § 42-46-6(c). Violations of these provisions are also actionable. G.L. 1956 §§ 42-46-5(b), -6(c) -8.
More particularly, the Act mandates that meetings may be closed to the public only when the Act specifically so authorizes and then only in conformity with specific procedures. G.L. 1956 §§ 42-46-4 -5. Those procedures ensure that the members of a public body are held publicly accountable for their decision to close a meeting by requiring that only those topics designated by the Act be discussed in a closed meeting and that each member's vote on the question of holding a closed meeting be recorded. G.L. 1956 § 42-46-4. The public body must cite to a specific section of the Act to support the call for a closed meeting. G.L. 1956 § 42-46-4.
The Act contains a definition of "meeting"-the "convening of a public body to discuss and/or act upon a matter over which the public body has supervision, control, jurisdiction, or advisory power." G.L. 1956 §42-46-2(a).
In reviewing the statutory language, the Court concludes that a public body does not "meet" unless it is convened such that it can exercise valid authority through a quorum of its members. The Court further concludes that a quorum must be present in order for the meeting to be subject to the requirements of the Act. In other words, meetings subject to the requirements of the Act must be formal assemblages of a public body called for the purpose of discussing or taking action relative to the responsibilities delegated to it. The statutory definition of "meeting" speaks in terms of the formal convening of a public body for the purpose of acting upon or discussing matters over which it has powers. Both the American Heritage Dictionary and Webster's New International Dictionary define "convene" as a formal meeting. Furthermore, the presence of a definition of "quorum" in § 42-46-2(d) must have some purpose. Like most public bodies, the Lottery Commission cannot take valid action without a majority of its members present. G.L. 1956 § 42-61-2.
Additionally, the Act distinguishes between members of the public body and the public body itself. G.L. 1956 § 42-46-5(b). In 1996, the language of § 42-46-5(b) placed no limitation on the purpose for which members of a public body could meet and communicate except that their meetings and communication could not be used to circumvent the spirit and requirements of the Act. G.L. 1956 § 42-46-5(b). The only limitation to that came in 1998 and that limitation was directed only to "discussions of a public body via electronic communication." G.L. 1956 § 42-46-5(b), as amended by P.L. 1998, ch. 379, § 1. Given the language of that subsection, the Court is further persuaded that the lack of limitation on meetings between the members of public bodies, as opposed to the formally convened body itself, was intentional and that the 1998 limitation was not enacted merely for clarification.
There is a plain distinction between the language of § 42-46-2(a) that defines "meeting" and the language of § 42-46-5(b) that contemplates discussion and meetings between the individual members of a public body. The Court credits the Legislature for having intended to allow informal, casual, and what are usually private discussions, communications, or meetings between the individual members of a public body when it adopted § 42-46-5(b). True, the term "meeting" is used in § 42-46-5(b), which, of course, implies a formal assemblage of the public body, but given the overall context the Court is not troubled by it. The Court concludes that the distinction was intentional and the Court is not inclined to dismiss the distinction made between members of a public body and a public body as a mere linguistic oversight on the part of the Legislature. The Court's reading of the two provisions is that the Legislature intended to strike a balance between letting in the sunshine and allowing for the efficient administration of the public business. The practical realities involved in imposing sunshine laws upon every meeting or discussion by governmental officials or their subordinates or colleagues must have been recognized by the Legislature. The Legislature was also presumably aware of the decisional law in many other jurisdictions that, in many cases, does not apply sunshine laws to meetings of members of a public body where less than a quorum of the public body is involved. Finally, the potential for abusing this less-than-a-quorum rule is clearly addressed by the legislative admonition in § 42-46-5(b) that "[n]o meeting of members of a public body or use of electronic communication shall be used to circumvent the spirit or requirements of this chapter." Overall, the Court finds the statutory language to be quite easily reconciled. It would have been a simple matter for the Legislature to have plainly stated that no meetings, discussions, or communications may take place between members except when the requirements of the Act are met.
The Court's analysis is also bolstered by the legislative history of the Act. The original title of § 42-46-5 was "Exceptions." Though the section title was eventually changed, the statutory language governing meetings and communications among the individual members of a public body falls along side of subsections (c) and (d) which are plainly exceptions to the Act. G.L. 1956 § 42-46-5(b) to -(d).
These sections stand apart from the provisions governing proper closure of a publicly-called meeting. G.L 1956 §§ 42-46-4 -5(a). Furthermore, proper closure under § 42-46-4 on its face requires that a majority of the members, a quorum by definition, be present. G.L. 1956 §§ 42-46-2(d) -4. To be sure, the definition of "meeting" includes working sessions and workshops. G.L. 1956 § 42-46-2(a). Implicit is that a "meeting" can include assemblages of a public body convened for purposes other than to take final action. Meetings that occur during the decision-making process and other processes of the public body are within the definition of "meeting." That is clear from the plain language of the statute. Nonetheless, the quorum requirement remains.
It is for these same reasons, the Court concludes, that chance encounters between members of the public body are not subject to the requirements of the Act. Implicit in the statutory definitions of "meeting" and "public body," and the English language definition of the word "convene," is that there be a public purpose behind the assemblage. G.L. 1956 § 42-46-2(a) (c). Furthermore, a chance encounter, by definition, has no purpose. That is not to say, though, that a chance encounter cannot attain the status of a meeting under certain circumstances.
Other justices of the Superior Court have concluded that the Act anticipates the presence of a quorum. Justice Savage so ruled in Attorney General Jeffrey B. Pine v. Charlestown Town Council et al., C.A. No. WC1995-491 (R.I. Super., June 4, 1997). And, though the factual details of the case are not disclosed in their opinion, the Rhode Island Supreme Court in a per curiam decision seemingly held that a quorum must be present before the technical requirements of the Act are triggered. See Fischer v. Zoning Board of the Town of Charlestown, 723 A.2d 294 (R.I. 1999).
Thus, the Court concludes that the technical requirements of the Act apply only to public bodies called to convene in a proper quorum and do not apply to the meetings and communications of individual members meeting or communicating in less than a quorum. The Court concludes that in Rhode Island the trigger for the technical requirements of the Act are twofold. First, there must be a governmental purpose-be it information gathering, discussion, or decision. G.L. 1956 § 42-46-2(a) (c). Next, there must be enough individual members present to determine their parent body's course of action regarding the matter at issue in the information gathering, discussion, or decision-that is, there must be a quorum present. G.L. 1956 §§ 42-46-2 -3.
Section 42-46-5(b) deserves an additional comment because of its significance for the individual members of public bodies who meet or communicate in less than a quorum. It is under the authority of that section and § 42-46-8(d) that members of public bodies who circumvent the First Amendment values driving the Act can be sanctioned as individuals. Thus, even where there is no quorum and the conduct of the public body is therefore not implicated, those individual members of the body who have attempted to circumvent the policy behind the Act are held accountable.
The Court's analysis holds obvious implications for the Court's application of the remedial provisions of the Act that are found at §42-46-8(d). That section permits the Court to issue injunctive relief and to declare null and void any actions of a public body found to be in violation of the Act. That section also permits the Court to impose a civil fine against the public body or any of its members found to have committed a willful violation of the Act. It follows that where the claim is that the members of a public body have met in circumvention of the spirit or requirements of the Act by communicating directly or indirectly in order to discuss or act upon a matter over which the public body has supervision, control, jurisdiction, or advisory power, then a quorum of the members must be involved if the public body itself is to be subject to the remedial provisions of § 42-46-8, including the provisions permitting injunctive and declaratory relief. Otherwise, the remedy is limited to a fine of the individual members found to be in willful violation.
The Court has also concluded that the Act does not preclude a public body from convening meetings for which the public has not been given notice at the beginning of the calendar year, the only caveat being that those meetings must fulfill the technical requirements of the Act and must not be held in circumvention of the spirit of the Act. The Act contains notice requirements governing meetings of public bodies. G.L. 1956 § 42-46-6. Public bodies must give annual written notice of regular meetings at the beginning of each calendar year. G.L. 1956 §42-46-6(a). In addition, public bodies must likewise give supplemental written public notice of any meeting within a minimum of 48 hours before the meeting.
G.L. 1956 § 42-46-6(b). Absent some clear indication that the Legislature intended to so constrain public bodies when it enacted the Act, the Court is hard pressed to read into this language an implied prohibition against calling meetings in addition to those that were set at the beginning of the calendar year as regular meetings. To prohibit public bodies from meeting at times other than those regularly scheduled or in the case of emergencies would not advance the purpose and intent behind the Act and could under certain circumstances have an adverse impact on the public interest. The use of the word "any" implies that there may be more meetings than those regularly scheduled meetings noticed at the beginning of the calendar year. G.L 1956 § 42-46-6(b). Furthermore, the Act specifically contemplates that emergencies may arise and that a meeting may be needed in response. G.L. 1956 § 42-46-6(c).
While § 42-46-6(c) may impose additional requirements when an emergency meeting is called, that language does not suggest that emergency meetings are the only alternative to regularly scheduled meetings.
The Court has also concluded that the Act requires that the written public notice be posted in two locations-both at its principal office as well as in at least one other prominent place within the governmental unit. Since the Lottery Commission has a principal office, the defendants contend that their obligation was to post written public notice there alone. The Court disagrees. In determining whether there has been a notice-posting violation, the Court must interpret § 42-46-6(c), which provides that "[w]ritten public notice shall include, but need not be limited to posting a copy of the notice at the principal office of the public body holding the meeting, or if no principal office exists, at the building in which the meeting is to be held, and in at least one other prominent place within the governmental unit."
The starting point is, of course, the text of the statute. The Court concludes that the comma following the word "held" indicates that the alternative provided if there is no principal office is self-contained, that is, that it ends there. If the clause that reads "and in at least one other prominent place within the governmental unit" applied only when there was no principal office, one would not expect a comma to come after the word "held." Though admittedly, the statute would never be used as a paradigm of grammatical form. While the apparent comma oversight at the beginning of the provision (that is, the lack of the comma closing the phrase "but need not be limited to") might not inappropriately lead one to be rather hesitant to place much emphasis on the Legislature's choice of punctuation, it seems to the Court that the insertion of the comma after the word "held," where the lack thereof would significantly impact upon the duty imposed, is significant notwithstanding the Legislature's apparent failure to properly punctuate in a place where such lack is really of no consequence-other than perhaps to bring into question the Legislature's grammatical attentiveness. Although our Supreme Court has stated that punctuation is considered to be one of the least reliable guides to construction, it may nonetheless be used to determine legislative intent so long as its use does not produce a result contrary to the otherwise expressed intent of the statute. Poirier v. Martineau,86 R.I. 473, 476-77, 136 A.2d 814, 816 (1957). Here, the use of punctuation does not produce a result contrary to the intent of the Legislature. Indeed, the Court's reading of the punctuation furthers the public policy expressed in § 42-46-1. As previously noted, that section provides that it is "essential to the maintenance of a democratic society that . . . the citizens be advised of and aware of the performance of public officials." Reading § 42-46-6(c) as requiring that two notices be posted even if a principal office exists furthers the legislative policy of making citizens aware of where and when public officials will be meeting, which is a necessary prerequisite for those citizens to be able to advise themselves of the performance of their public officials.
 III. The evidence.
The trial evidence included a number of exhibits that reveal the political climate and the public concern that surrounded the Lottery Commission and its executive director, John P. Hawkins, in March 1996. Those exhibits include various newspaper articles, commentary, and press releases. The defendants offer this evidence in part to show the public nature of the Hawkins controversy. The plaintiffs offer this evidence in part to show that prior to the March 25th meeting, Governor Almond had secured the Commissioners' agreement to vote to terminate Hawkins. To the extent this evidence is proof of the circumstances within which the parties and the witnesses found themselves at the time, the Court gave it considerable weight. The Court considered the witnesses' testimony within the context shown by these exhibits. The Court gave little weight to the exhibits to the extent they have been offered to prove the truth of the matters asserted in them.
These exhibits are consistent with the witnesses' descriptions of the public nature of the events surrounding the Lottery Commission in early 1996. The Court finds as a matter of fact that the question of Hawkins' tenure as the executive director was, indeed, at the epicenter of considerable public and political turmoil and negative publicity.
The exhibits also show that the Governor and certain journalists were pressing for Hawkins' removal and that the Speaker of the House and Senate Majority leader later joined the fray by publicly calling on the Commission to oust him. This too was consistent with the witnesses' testimony. The Court finds that it was the largely the Governor who drove the call for Hawkins' termination.
Ralph Flemming testified. He was a public member of the Lottery Commission in March 1996. That is, he was not a member of the House or Senate. The Court found him to be a credible witness. Flemming testified that Hawkins was doing an exemplary job as the executive director. Under Hawkins' management, Lottery revenues had increased substantially. He also testified that he was unaware that a meeting was to take place on March 25, 1996. He testified that had he known there was to be such a meeting or that Hawkins' position as executive director would be discussed at any meeting, he would have made a point of attending. He would have spoken in favor of retaining Hawkins and would have reminded the Commissioners that the press reports concerning Hawkins were untrue. By the evidence, it was generally known among the Commissioners that Flemming supported Hawkins in his job as executive director. Flemming testified that during the events leading up to the March 25th meeting he had no communications with any Commissioners except Frank Galleshaw. Galleshaw and he were in Florida at the time. They discussed Hawkins' tenure as executive director and found themselves to be of the same mind. In his testimony, Flemming acknowledged the general turmoil surrounding the Lottery Commission and testified that he received an unexpected telephone call from Speaker John Harwood.
This call came the week before the March 25th Commission meeting. It was at that time that Flemming told Harwood that he, Flemming, believed Hawkins was doing a good job managing the Lottery.
Flemming also told Harwood that Flemming intended to leave soon for Florida but could change his plans if any Commission business was expected to become pressing in the upcoming days. Based upon Harwood's comments in the negative, Flemming went to Florida and thus was unable to attend the March 25th meeting. The Court accepted Flemming's testimony and finds it to be true and factual. Edward Lawrence testified. He was a member of the Lottery Commission at the time. He, too, was a credible witness and the Court accepted his testimony as true. He found Hawkins to be doing an excellent job at running the Lottery. Lawrence testified that he was present with Senator Kelly and Commissioners DeBatt and DiSandro when then chief of staff Moribito attempted to persuade the Senate members of the Commission to fire Hawkins. It was Lawrence's testimony that the members listened to Moribito but did not engage in any substantive discussion with him. For his part, Lawrence remained silent and unpersuaded. Senator Kelly, according to Lawrence's testimony, flatly rejected Moribito's "30 pieces of silver." This was a reference to the inducement promised by Moribito if the Senate members of the Commission would agree to depose Hawkins.
Lawrence testified that he and Kelly thereafter made an attempt to negotiate Hawkins' resignation but that attempt was unsuccessful. The Court accepted all of this as true fact.
Lawrence testified that it was later on that he came to his own conclusion that Hawkins should leave the post as executive director. The Court finds that to be true. The Court also finds that Lawrence shared his thoughts with Kelly and with Hawkins and that he joined in a press release concerning the matter but that he did not communicate with the other Commissioners concerning Hawkins' termination.
The Court accepted this as true also.
Lawrence testified that several days before the March 25th meeting Kelly called Lawrence to his office and inquired of Lawrence to determine whether Lawrence was of a mind to terminate Hawkins.
Lawrence acknowledged that he had reached that point and would so vote. Lawrence testified that Kelly did not raise the question of holding a Commission meeting. According to Lawrence's testimony, Lawrence was afraid the adverse publicity would have a negative effect on the Commission. He cited Commission business and pending legislation and his fear that both could become mired in the negative publicity. Lawrence described his concern and reservations about terminating Hawkins-reservations that he indicated haunt him today. The Court accepts Lawrence's testimony as true but also finds based on all of the evidence that Lawrence's decision was driven in part by the Governor's public attack on him and Senator Kelly. The Court finds it was that attack that cemented Lawrence's vote.
Lawrence testified that he could not be sure if or when he may have received any notice of the March 25th meeting.
There was evidence that Lawrence's testimony was not accurate in some respects but the Court was not troubled by it. Rather, the Court attributed the discrepancies among the various witnesses' versions of events as those that can ordinarily be expected to occur when different individuals are called upon to recollect the details of events occurring years ago. Overall, the Court found Lawrence to be credible on the material points.
Frank Montanaro testified. He, too, was a Commissioner at the time of the events in question. He was familiar with the Act at the time. He recalls that he was vice chair of the Commission at the time. He testified that he received notice of the March 25th meeting by a message left on his answering machine. He did not recall who left the message. He did not recall having seen any written notice of the meeting. He did not recall having seen the agenda except at the meeting.
Nevertheless, Montanaro testified that he knew why he was there that day. The back and forth of media conversation had led him to conclude he was there on the Hawkins matter. That, he testified, was his own evaluation of the events leading to the meeting of March 25th. That testimony is consistent with the balance of the evidence and the Court accepted it as true. Montanaro was a poor witness, generally. At times his responses to questions were nearly incomprehensible. The Court did not perceive him to be evasive so much as pained by this process. He seemed nervous and upset. He was credible, though, and the Court accepted his testimony as true and factual.
Montanaro was unshaken and credible in his testimony that he did not discuss Hawkins' termination with anyone prior to the meeting of March 25th. The matter was one of considerable concern for him and he kept it to himself. Montanaro did not speak with any legislative leaders concerning Hawkins' termination nor did he communicate with the Governor about it. The Court accepted this as true and finds it to be fact.
Montanaro described the tension he believed was mounting between certain of the Commissioners and Hawkins. Montanaro cited tension over Commission procedures and Hawkins' management style. As the makeup of the Commission changed and became more conservative, conflict developed and there seemed to be an ongoing tug of war between some of the Commissioners and Hawkins. Montanaro testified that he made up his mind on the day of March 25th about how he would vote should the question be put to the Commission. The basis for his vote to terminate was the public's perception of the Commission and of Hawkins' job performance. Montanaro testified that he had personally met with Hawkins and encouraged Hawkins to make the changes necessary to change his style or approach. Montanaro agreed that Hawkins performed admirably in running the Lottery. The Court accepted all of this as true and factual.
It is true that Hawkins denied that Montanaro ever encouraged Hawkins to mend his ways but the Court was not troubled by that discrepancy. It is the fact finder's right and obligation to consider the evidence in light of its own experience and it is this fact finder's experience that two people can come away from the same conversation having very different opinions about the substance of the conversation.
Like the other witnesses, Montanaro offered no direct evidence concerning conversations or communications that other Commissioners may have had with others whom the plaintiffs have alleged acted as conduits of communications.
Christine Callahan testified. She was credible. She quite readily admitted that she had been outspoken in her opinion that gambling should not be expanded unless the question went to the voters.
She kept it no secret that she thought Hawkins should resign. She quarreled with Hawkins' management of the Lottery and objected to the placement of lottery machines in public places and the use of video lottery terminals. They had disputes that became public. Callahan admitted that she had long since decided she would vote to terminate Hawkins and that she would not pass up an opportunity to do so.
By March 20th or 21st, she considered Hawkins an embarrassment. Callahan testified that she spoke with her fellow Commissioner, Michael DeBatt, on the Wednesday or Thursday during the week before the meeting at which Hawkins was fired. They spoke about the question of Hawkins' termination and agreed they would request a meeting of the Commission to take up that issue. They also agreed DeBatt should communicate with another Commissioner, Donald Wyatt, and that Wyatt should ask the Chair to convene a meeting at which the Commission could consider the subject of Hawkins' termination. They did not discuss any date upon which such a meeting might be held. The Court accepted all of this as true and finds it to be fact.
Callahan testified to her belief that political appointees such as the Commissioners could be expected to respond to the opinions of the state's political leadership and their own appointing authorities. She agreed that the leadership's calls to remove Hawkins had an impact upon her decision to call for a special meeting. This testimony was unremarkable given the nature of the American political system. It takes no unusual experience or observation to understand that political leaders expect to set policy objectives and that they expect their political appointees will be responsive to those objectives and will make efforts to implement them. The Court infers from the evidence that the situation here was no different. One need only look at the makeup of the Commission to understand that the Lottery is under the joint control of the state's political leadership. The Court finds that the Commissioners indeed responded to the leadership calls for Hawkins' removal and that the meeting of March 25th was the culmination of that response. The Court finds, based upon all of the evidence in the case, that the leadership's very public statements and press releases concerning Hawkins and his termination were intended to and did influence the Commissioners' conduct during the March 25th meeting.
Callahan testified that it was the building series of media reports that caused her to take action and not any direct request from the Governor or his staff. Callahan testified that she had no conversations with any of the Commissioners about the matter except her conversation with DeBatt.
There is no question in the Court's mind that Callahan recognized that the pressure from the Governor and the media ripened the question of Hawkins' tenure as executive director. The Court finds that she seized the moment when she joined in the call for the meeting.
It was Callahan's testimony that she knew of no reason why the matter could not be addressed at a regular meeting of the Lottery Commission but that she and DeBatt preferred a special meeting because the negative publicity was mounting. Callahan testified that it was her belief that it was in the best interests of the Commission to resolve the matter sooner and begin the task of restoring credibility to the Commission. When examined closely on the subject of the timing of her call for a meeting, her contacts with the Governor and his staff, and the garnering of votes, Callahan was firm. She spoke to no one in the Governor's office until after she called for the meeting of March 25th. The only communication she had with the Governor was a telephone call the afternoon of March 25th. It was then that the Governor called her to encourage her to vote to terminate Hawkins. She responded that she intended to do so.
Callahan testified that she never instigated a polling of the potential votes to depose Hawkins and that she, herself, was never canvassed or polled by any other Commissioner. She knew nothing of the other members having been polled by anyone else. She agreed that she may well have had chance meetings with other Commissioners but that there was no discussion of Hawkins' termination. The Court accepted Callahan's testimony to be true and finds it to be factual.
Domenic DiSandro testified. He testified that it was by chance that he came into the meeting that took place in Senator Kelley's office when Moribito raised the question of Hawkins' termination.
DiSandro testified credibly that he participated in no discussion other than to respond to a question from Moribito about how DiSandro would vote if Hawkins' termination were presented to the Commission.
DiSandro acknowledged his present intention. He was not involved in or privy to the balance of Moribito's comments or the discussion. The Court accepted this as true fact.
Frank Galleshaw's interrogatory answers are in evidence. They are consistent with the balance of the evidence including the testimony of Ralph Flemming, John Hawkins, and the other witnesses. The Court finds that Galleshaw was a supporter of Hawkins in his position as executive director and that Galleshaw, like Flemming, would have argued on Hawkins' behalf were he given the opportunity to do so at a Commission meeting. Galleshaw, like Flemming, was a public member of the Commission.
The interrogatory answers of the other Commissioners are in evidence as are the answers to the special interrogatories propounded to the Speaker of the House, John Harwood, the Senate Majority Leader, Paul Kelly, and Governor Lincoln Almond. The information contained in those answers was generally consistent with the testimony of the witnesses and the rest of the trial evidence. Robert Flaherty testified. He was, and continues to be, the Lottery Commission chair. He is an experienced, practicing attorney. In his testimony, Flaherty agreed that the Commission is obligated to comply with the Act. He testified, however, that he was only generally familiar with the Act and left to the Lottery staff matters such as the publication of notice of the Commission's meetings. Flaherty was either reluctant to or unable to articulate even the gist of the Act's requirements. He claimed to have no recollection that the Commission's attorney had prepared and distributed memoranda explaining the requirements of the Act after one of the Commission's meetings had been called into question because of concerns over possible violations.
Flaherty was not a credible witness. His recollection of events was spotty and selective and he often based his testimony upon his assumptions about what must have happened. He was willing to guess where his answer might help the Commission. His answers to questions were not as forthright as those of the other witnesses and Flaherty was often artful as he sought to deflect the substance of certain questions. His testimony was inconsistent with other evidence including his own answers to interrogatories. His recollection of matters that were helpful to the Commission was better than his recollection of matters potentially damaging. Flaherty testified that he was unable to recollect what documents he reviewed during the previous week in order to prepare for his testimony. His demeanor and the way he acted while he was testifying indicated that he was avoiding the truth and that his answers were artfully crafted for that purpose.
Flaherty initially testified that he received Wyatt's letter on Friday, March 22, 1996. Next he testified that the letter was not addressed to his law office and that he had no recollection of how it was that he came to receive it. When challenged with his interrogatory answers in which Flaherty stated he had no recollection as to whether or not he received any letter from Wyatt prior to the time he scheduled the March 25th meeting, Flaherty became certain that he did in fact receive the letter on the Friday before the meeting. He testified that he had no recollection of speaking with Wyatt that Friday.
When challenged again with his interrogatory answers, Flaherty testified that Wyatt did indeed call him to request the meeting be scheduled. A moment later, Flaherty testified that he had no recollection of anything Wyatt said in the phone call but presumed Wyatt called to discuss the contents of the letter.
Then Flaherty testified that he had no recollection of what Wyatt said to him when he called or where Flaherty was when he received the call. He did not know what time Wyatt called.
Flaherty testified that to the best of his recollection he called Margaret Rose, Hawkins' confidential secretary, and directed her to post a notice of a meeting for the following Monday. He did not recall if he told Rose what the meeting was about or what the notice should include. He did not recall if he mentioned to her anything about Wyatt's letter. He did not recall telling her that the meeting was an emergency or what time it should be held. He did not recall what time he called Rose. He did not recall speaking with anyone else on that Friday regarding the Monday meeting. He testified that he did not notify either Frank Galleshaw or Ralph Flemming of the Monday meeting. He denied knowing where they were at the time and testified he did not know why they were not at the meeting. He denied knowing they were out of state. He denied notifying any individual about the meeting.
Flaherty's testimony was directly contradicted by the testimony of Margaret Rose who testified that he told her he had personally notified most of the Commissioners about the March 25th meeting. His testimony was also contradicted by the executive session minutes for the March 25th meeting that records Flaherty as informing the Commission that Flemming was in Florida at the time.
The minutes of the March 25th meeting do not reflect how Flaherty came to know Flemming was in Florida at the time of the meeting. It is unknown whether Harwood told him or whether he learned from some other source.
Flaherty was questioned about the written notice and how the meeting came to be denominated as an emergency. The evidence is that Wyatt, in his letter, called for a special meeting and did not request that it be held on any particular date. The evidence was also that it was the practice of the Commission to give a minimum of 48 hours notice when it called special meetings. Flaherty testified that the notice of the meeting was not his work product and said he did not know who denominated this meeting as an emergency meeting. He implied that it was the individual preparing the document who must have chosen the words. This was directly contradicted by the testimony of Rose who testified that it was Flaherty who directed her quite specifically concerning the contents of the notice. Flaherty's statements as recorded in the minutes of the meeting of March 25th also contradicted his trial testimony in this regard.
Notwithstanding his testimony that he left the denomination of the meeting to Rose, Flaherty attempted to explain why, in his mind, the matter was what he referred to as being "of an emergent nature." He testified that he thought the negative publicity surrounding the Commission required that action be taken prior to the next regularly scheduled meeting and that the request by a Commissioner to convene a meeting was sufficient to cause him to schedule a meeting. He pointed to the media circus that was affecting the integrity of the institution and that it seemed to him to be prudent to call a meeting in response to a Commissioner's request. He fell short of making an affirmative statement that he believed a true emergency existed. The Court took his testimony as an effort to remain consistent with his statements appearing in the minutes of the March 25th meeting. The minutes of the March 25th meeting record Flaherty indicating his intention to call the meeting under the emergency provisions of the Act and his belief that the Commission could thus convene without the normal 48 hours notice. The minutes, together with the other evidence, make it plain to the Court that Flaherty knew on March 22nd that there would be less than 48 hours between the time the notice was posted and the opening of the Monday meeting and that it was therefore necessary that he treat the matter as if it were an emergency.
Based on this and the balance of the evidence in the case, the Court finds as a matter of fact that Flaherty scheduled the meeting less than 48 hours before it was to take place and that he was aware of the notice requirements of the Act when he did so.
But even giving Flaherty credit for believing the matter to be of an emergent nature, if not a true emergency, Flaherty still offered no credible explanation of why he found it necessary to call the meeting on such extremely short notice and over a weekend.
The minutes of the March 25th meeting show that in response to Commission-attorney Silva's voiced concerns about potential violations, Flaherty told the Commission that he had called the meeting as an emergency after speaking with Silva. Yet, in his answers to interrogatories, Flaherty hedges the question about a phone call to legal counsel on the afternoon of March 22nd, a phone call that Silva testified he did not recall as having taken place but which the Court finds Silva would likely remember under the circumstances of this case. At trial, Flaherty did not recall any such conversation. The Court finds that the telephone call never took place and that Flaherty did not call Silva.
The Court finds that it was as a result of Flaherty's statement to Rose that she abandoned her usual practice of notifying the Commissioners about the meeting. The Court accepts as true Rose's testimony that Flaherty told her that he had notified most of the Commissioners. The Court concludes from the evidence that the ones he did not notify were, more probably than not, Flemming and Galleshaw, the two members who could be expected to argue Hawkins' record of achievements as executive director.
Flaherty was questioned about the sufficiency of the public notice. He hedged, pointing out that because he was not a member of the general public he could not comment on whether a member of the general public would understand the nature of the business to be considered. He avoided the obvious for as long as he possibly could, which was that the notice in and of itself gives no clue about the nature of the business to be discussed.
The Court has reviewed and considered the public notice that is found at exhibit 1. The Court finds that the notice, on its face, fails to give the public fair notice of the nature of the business that the Commission would discuss at the meeting such that a citizen could make a meaningful determination about whether or not he or she should attend. It is undisputed that the Wyatt letter was not posted with the notice. The Court finds this as fact.
When questioned further about the contents of the public notice and whether he thought the notice advised the public of the topics to be discussed, Flaherty testified that he had thought the media reporting was doing a sufficient job at keeping the public notified about what could be expected to take place at any special meeting of the Commission. He also testified to his belief that the public would learn of the meeting through a Providence Journal article of March 23rd. He became visibly flustered when he realized that this article was not published until the day after he directed Rose to post the public notice.
The moment was not of great consequence but it spoke again to his credibility. The suggestion that Flaherty relied on the press reports to make up any deficiency in the public notice is not consistent with this testimony or his testimony that he left all such considerations to staff.
It is not lost on the Court that the March 23rd article did not go to press until early evening on March 22nd. The article reported that a meeting could be held as early as Tuesday, March 26th. The Sunday edition of the Providence Journal did not mention a Monday meeting. The logical inference is that even the Providence Journal reporters, who were hot on the subject and nearly staking out the Lottery Building, did not learn of the meeting in time to go to press on Saturday night. One can infer that not even the journalists had thought to determine if a notice of meeting had been posted at the Lottery offices over the weekend. The Court finds that the average citizen could not have been expected to learn of a meeting through notice posted at the time and location that this notice was posted.
The Court does not believe that Flaherty thought the notice to be adequate in informing the public about the nature of the business to be discussed. The Court also finds that Flaherty's stated belief that the notice was adequate or would be effective in meeting the policy objectives behind the Act was unreasonable even if truly held.
When the meeting of March 25th was convened and Silva warned Flaherty and the Commission about the deficiencies in the public notice, Flaherty declined to abort the meeting and, instead, led the Commission into the violation that triggered the plaintiffs' complaint. The Court finds that Flaherty did so without regard to the requirements of the Act. The Court finds that his attempt to rectify the violation by adding Hawkins' termination as an agenda item through a majority vote of the Commissioners was nothing more than a further effort at manipulating the technical requirements of the Act.
Minutes thereafter, Flaherty led the Commission through a closed session where the discussion turned to matters plainly in violation of §42-46-4.
The Commission, of course, has conceded that there was no emergency within the contemplation of § 42-46-6(c) and Flaherty conceded in his testimony that the meeting was not called upon a vote of a majority of the Commissioners.
Robert Silva testified. As previously noted, Silva was the Lottery Commission attorney who regularly advised the Commission on issues relating to the Act. Silva described the events leading up the March 25th meeting. Silva testified that he had schooled the Commissioners in the requirements of the Act and that he had gone so far as to prepare for them a memorandum outlining the Act and the Commission's responsibilities in complying with it. The evidence is that Silva undertook to do this at least in part as a response to a possible violation of the Act occurring in connection with the Commission's vote to raise Hawkins' pay. That vote, taken in executive session, brought the Commission significant criticism and resulted in their taking a new vote in open session. The Court accepted Silva's testimony as true and factual.
The Court finds that the Commissioners had knowledge that the Act included notice requirements that the Commission was obligated to follow. The Court finds that they understood the potential consequences of a violation.
Silva testified that the Lottery staff secretary, Margaret Rose, called him the afternoon of March 22nd. Silva was uncertain as to the exact time but he recalls it to have been late-perhaps as late as 5:00 p.m. Rose asked Silva for his advice concerning the notice and posting requirements for a Monday afternoon meeting. Silva informed Rose that she must post any notice at least 48 hours in advance of any meeting unless the matter was an emergency. Silva testified that Rose did not disclose to him that there was some emergency, or, if there was an emergency, what that emergency might be. The question of an emergency came up only in the context of Rose's questions about the posting of the notice. Silva told her that if it was an emergency, she must post the notice as soon as possible. All Rose could tell Silva was that it had to do with some unidentified correspondence to the chair. Silva did not recall having received any call from any Commissioner that afternoon. Something, the Court finds, that he would have been expected to recall under the unusual circumstances as have been shown by the evidence to exist in this case. The Court accepted Silva's testimony as true and factual.
Silva testified that it was not until the meeting itself that he saw the Wyatt letter or understood its content was to request a special meeting for the purpose of considering Hawkins' termination. To the best of Silva's recollection, the letter had not been posted as part of the public notice. Silva testified that he warned the Commission that their meeting was in violation of the Act. He pointed out to them that there seemed to be no emergency and, in any event, the Wyatt correspondence had never been posted at all, much less a minimum of 48 hours in advance of the meeting. Silva testified that the Commission pressed on with the meeting after adding Hawkins' termination to the agenda as an attempt to cure the looming violation. His testimony is supported by the minutes of the March 25th meeting. The Court accepts his testimony as true and factual.
Silva testified that he thought the meeting must have something to do with Hawkins or bingo. His knowledge seems to have come from his general awareness of the events surrounding the Commission.
Silva testified that the media was in attendance at the March 25th meeting and that the room was packed with individuals not usually in attendance. Silva testified that it was Hawkins who demanded that any discussion concerning his job be held in the open and not in closed session. The Court accepts this as true and factual.
James Connolly testified. He was the Commission's marketing director. He arrived at the Lottery Commission offices at 7:30 a.m. on March 25th. He recalled having learned from the media reports that there was to be a Lottery Commission meeting that night. He noticed that the notice and agenda that would normally be posted on the Lottery Commission door were not there. When he left work the Friday before, there had been no notice posted. Connolly testified that he would routinely look at the posted notice to determine whether the upcoming meeting held any interest for him. The Court found Connolly to be credible and finds that there was no notice posted at the Lottery Commission headquarters on either the Friday afternoon or Monday morning. The Court accepted that, under the circumstances, Connolly would have noticed and taken note of the posting had it been in place. The Court finds this as a matter of fact.
Paul Berardi testified. He was a Lottery employee on March 25, 1996. He arrived at the Lottery headquarters at 7:15 that morning. It was his usual routine to notice postings for Commission meetings. He noticed none that morning. The Court found him credible and accepted his testimony as true.
Gerald Aubin testified. He ultimately became the executive director after Hawkins was fired. Aubin was credible. He testified that he was approached by then chief of staff Moribito on March 21st and asked if he would be interested in the job. Aubin was unable to shed light on the question of whether any Commissioners had attempted to use Moribito, the Governor, or anyone else as conduits for the purpose of effectuating a meeting outside of the public eye. Moribito did not discuss the question of how or when Hawkins might be terminated. Aubin was able to take that from the general context provided by the news media. Moribito never indicated that the job was open or would be open.
Aubin testified that he received a call from a newspaper reporter with the Providence Journal on March 25th and that the call prompted him to call Moribito. The newspaper reporter wanted to know if Aubin was a nominee. Aubin testified that Moribito told him there would be a Commission meeting at 4:00 p.m. and that Aubin might be needed at the State House. At about 3:30 or 4:00 p.m., Aubin received a summons to go to the State House. There he met with Governor Almond. They agreed there would be a 5:00 p.m. press conference at which Almond would introduce Aubin as his nominee as executive director. According to Aubin, he and Almond never discussed whether there were enough votes to depose Hawkins or to appoint Aubin.
The Court accepted Aubin's testimony as true. It is consistent with the balance of the evidence including the documentary exhibits that show the public and political context of the day.
Aubin's testimony had limited inferential value for the Court. The timing of the March 25th afternoon press conference and that of the call summoning Aubin to meet with Almond gives rise to the inference that Almond must have been reasonably sure in his own mind that the Commission would indeed meet and that that meeting would result in Hawkins' termination. Beyond that, however, Aubin's testimony did not shed light on the narrower questions concerning the Commissioners' conduct or the role the Governor's then chief of staff may have had in standing as a conduit for communications between the Commissioners. Given the media attention surrounding the Hawkins matter, it could be equally true that the Governor and his staff drew from the media reports in order to gauge the success of their lobbying efforts, press releases, and public statements.
The plaintiff, Catherine E. Graziano testified. The co-plaintiff, John P. Hawkins, is her brother. Graziano was a credible witness. She is well-spoken, intelligent, and articulate. She presented herself as a gentlewoman. After observing her testify, it is this Court's estimation that she was sincere in bringing the Open Meetings Act complaint against the Commission and that she brought it out of genuine concern that the Act requiring open government was violated. If she believed otherwise she would not have joined as a plaintiff-brother or no brother.
Graziano's description of the events of March 1996 was consistent with the rest of the evidence. Graziano had her own fingers on the pulse of the Commission and the State's political leadership. She testified that she spoke with Edward Lawrence regularly and that he had assured her repeatedly that he would not vote to terminate Hawkins. He kept her abreast of the goings on at the State House insofar as they concerned Hawkins' tenure as executive director. She thought that her brother's job was not truly in jeopardy. She discounted the press reports as untrue partly because of her own information and partly because of her experience that the reporting in the Providence Journal is often misleading or inaccurate. She testified, too, that even though she followed the media reports, she did not learn from those reports that there was to be a Lottery Commission meeting on March 25th. She testified that she learned of that meeting from her brother, John Hawkins, the co-plaintiff. She attended the meeting because of her concern for her brother whom she believed was being badly treated by the media.
Graziano testified that the Commission's posted agenda was not helpful to her in understanding the nature of the Commission business to be discussed. Again, she had followed the media reports but for the most part she discounted them. Clearly, though, she was on guard when she attended the meeting. That is evidenced by her use of her tape recorder. Graziano denied that the Commission chair, Flaherty, met with Hawkins prior to the meeting. This was in direct contradiction to Flaherty's testimony. Of the two witnesses, the Court found Graziano to be the more credible and the Court accepts her testimony in that regard as fact.
Graziano testified that she did not see any notice of the Commission meeting posted at the State House on the day after the meeting. It was her testimony that such notices were usually left on the bulletin board for some time after. The Court accepted this as true and factual Margaret Rose testified. By her overall demeanor, the Court found her to be truthful but her memory was clearly faulty on a number of points and she was contradicted on different points. Her trial testimony was that she told Dennis Tripodi, a lottery staffer, about the March 25th meeting. Yet, her deposition statement was that she notified no one about that meeting. The Court did not find her to have well reconciled this discrepancy. She faltered in the explanation. Her demeanor changed and she clearly had no confidence in the explanation. It was in contrast to her later concession that she indeed did not recall the number of members of the public in attendance on March 25th. In that, she seemed comfortable notwithstanding the concession.
Rose denied having spoken with Hawkins on Sunday, March 24th. She denied that she told Hawkins that Flaherty directed her not to tell Hawkins about the meeting. She also denied that she told Hawkins that she had not posted the notice on the front door of the Lottery building. This, of course, was in conflict with Hawkins' testimony.
Rose testified that she called Hawkins' cell phone several times during the afternoon of March 22nd and that she spoke with Dennis Tripodi whom she told about the Monday meeting. The gist of Rose's testimony was that because she was calling Hawkins' cell phone and because Tripodi was answering, Rose was operating under the belief that the two men were together and that Hawkins' knew about the meeting. She thought Tripodi was relaying the message to Hawkins. Thus, she would have had no need to call Hawkins over the weekend. However, Rose could not be sure when she actually spoke with Tripodi. It could have been as late as 5:30 p.m. or as early as just after lunch. The cell phone records that are in exhibit contradict her testimony. They show no activity for Hawkins' cell phone after 3:00 p.m. that afternoon except voice-mail retrieval. This circumstantial evidence lends credibility to Hawkins' testimony that he was at home when Rose called him over the weekend to inform him about the meeting.
Rose's deposition testimony has been admitted as a full exhibit. For the most part it was consistent with her trial testimony except as the Court has noted.
Rose testified that she received a call from Robert Flaherty late in the day on March 22nd. Flaherty instructed her to prepare and post a notice of meeting for the following Monday, March 25th. Rose testified that Flaherty was explicit in instructing her about the precise language of the notice and instructed her specifically to denominate the meeting as an emergency. Flaherty did not disclose to Rose what the emergency was or the nature of the correspondence that she was to list as an agenda item. She did not recall when in the afternoon of March 22nd that she posted the notice but in her deposition she acknowledged that she posted it at the end of the day. At trial, she testified that she posted the notice on the front door of the Lottery building before she left work. She also testified that she did not leave work that day until about 5:45 p.m. She also testified that it was not until at least 3:30 or 4:00 p.m. that Attorney Silva and she spoke. They discussed the notice and she read the proposed agenda to him including the wording in which the meeting was denominated as an emergency meeting. Silva, she said, told her the notice was appropriate to post. The Court accepted this testimony as true and factual.
Rose testified that it was the Lottery Commission's usual practice to post a copy of meeting notices on the bulletin board at the State House. It was Rose's belief that this may have been done as a courtesy to the Commissioners who were also legislators but, of course, Rose's belief in this regard has no bearing on the Court's determination concerning the number of notices that must be posted and at what locations they must be posted. Rose also testified that it was her ordinary practice to notify all of the Commissioners of meetings by providing them, well in advance, with a copy of the notice and agenda as well any other relevant material. She testified that she would also call each of them the day of, or a day or so before, the meeting as a final reminder and to ensure that there would be a quorum in attendance. It was Rose's testimony that she did not personally deliver a copy of the notice to the State House that day. Instead, she placed it in the outgoing mail basket for delivery to the State House. The Court accepted all of this as true. Based on all of the evidence, the Court finds as a matter of fact that if the notice of the March 25th meeting was indeed posted on March 22nd, it was not posted until after 4:00 p.m. The Court also finds that the notice was not posted in a second location.
Rose testified that Flaherty did not disclose to her that the purpose of the meeting was to terminate Hawkins. Rose also testified that Flaherty told her that he had notified most of the Commissioners and that they were "all set." She testified that it was because of his representations to her that she abandoned her usual routine of notifying the Commissioners of the meeting and checking to determine that a quorum of the members was planning to attend. The Court accepted this as true and finds it to be fact.
Rose denied having spoken with Hawkins over the weekend. As already indicated, she testified that because she thought he was with Dennis Tripodi that afternoon she did not speak to Hawkins directly about the meeting and never called him over the weekend. In her deposition, Rose testified that she did not recall if she informed Hawkins about the meeting. Rose testified that it was on Friday, March 22nd that Hawkins began to clean out his desk. She recalled him taking a candy dish, a coffee pot, and other personal items. Her testimony conflicted with that of Hawkins who testified that she called him over the weekend and told him Flaherty had instructed her not to tell Hawkins about the meeting.
The Court was not particularly troubled by these discrepancies in the testimony. On which day Hawkins cleaned out his desk of a candy dish and coffee pot is not a detail that either should necessarily be expected to recall with great accuracy under the circumstances. On the other hand, Rose has consistently remembered that Flaherty made statements to her that led her to think that she need not notify anyone of the meeting. Hawkins' recollection that she said Flaherty directed her not to tell him, Hawkins, about the meeting is not so far off the mark as to take the conflicts in their testimony out of the realm of the expected. And whether any conversation between them took place after business hours on March 22nd, over the weekend, or on March 25th is likewise not an important detail when viewed against the overall context.
The testimony that is more difficult to reconcile, however, is Hawkins' testimony that Rose told him she never posted the notice on March 22nd and that she, instead, left it on his desk. The circumstantial evidence bears out the truth of those statements. No witness has testified that he or she saw the notice on March 22nd and several witnesses have testified that they did not see it posted at the Commission building on the morning of March 25th. The Court has accepted the credibility of those witnesses and has found that they likely would have noticed the posting if it had been in place on the morning of March 25th. Hawkins' version of the conversation where he recounts that Rose told him it was too late to get the notice to the State House is a detail lending support to his recollection of the events.
However, having observed the witnesses in their testimony and having considered their testimony in light of the other evidence, the Court cannot say that it was proven by a preponderance of the evidence that Rose did not post the notice at the Commission building that day. Despite some of her memory lapses and the difficulties she had with factual details, the Court found her to be generally credible. And she appeared credible when testifying about this particular matter. Furthermore, the Court does not believe that she would have ignored Flaherty's directive to post the notice or that she would instead leave it on Hawkins' desk only to call him so late as Sunday about it. What happened to the notice between Friday afternoon and Monday morning, how it came to be posted on Monday, and what actually happened between Rose and Hawkins this fact finder cannot say. The Court finds the evidence to be evenly balanced on this point. The Court finds this even in light of its previous finding that Hawkins, too, was very credible when he testified about what Rose told him during the weekend phone call and about the ensuing events.
In any event, the question of whether Rose posted the notice as opposed to having put it on Hawkins' desk becomes of little consequence in light of the Court's finding that it was posted less than 48 hours prior to the meeting if, indeed, it was posted at all that day. One way or the other, there was a violation of § 42-46-6(b).
Katherine Gregg, Scott McKay, and Charles Bakst testified, as did Zachary Malinowski. They are all journalists with the local newspaper, the Providence Journal. Each of them participated in writing articles or editorials about the events of March 1996. They did not remember specifically anything that was said to them by the Commissioners. Nor could they testify to any facts that lent themselves to the plaintiff's claims concerning the surreptitious meeting or clandestine communications that plaintiffs allege to have taken place in violation of the Act. On one point Gregg's testimony was interesting, though.
Gregg was questioned about an article that appeared in the newspaper on March 26th and which spoke in terms of the votes to remove Hawkins as having been "secured." The implication, of course, is that some person did the securing. The obvious question is "Who did the securing?" In watching her testify, though, it was plain that the implication was lost on Gregg. The ultimate point is that it is important not to attach too much significance to the choice of words appearing in these articles and that the inferences they yield are not always intended or understood by the writer. While the journalists may insist on the accuracy of their reporting, it is clear that it is dangerous to read too much into the precise language of newspaper articles written under deadline and subject to editing for size. The Court has given little weight or inferential value to the contents of the media reports.
John Hawkins testified. He was generally a credible witness though at times he became testy on cross-examination. Hawkins showed himself to be intelligent and articulate, though less polished than his sister.
Hawkins also testified about his handling of the Lottery. It cannot be disputed that from a business standpoint he performed exceptionally. It was under his directorship that the Lottery became regarded as one of the most successful in the nation. Its revenues grew from 20 million dollars a year to an unprecedented 90 million dollars. If a Lottery is to raise revenue for the State, as this Lottery was incepted to do, then certainly Hawkins pursued that goal diligently and effectively. He ran it like a business and, in spite of the relatively small pool, Lottery revenues leapt by some 50 million dollars in just two years. This the Court can readily find as fact. It is just as true, too, that suggestions of wrongdoing on his part proved to be unjustified and ill-founded. The Court also finds as fact, though, that as aggressive as Hawkins may have been in pressing the objective of increasing revenue, it was his success in this regard that contributed to his downfall. A change in the state government leadership and the public perception that gambling had become too pervasive led to a shift in the state's political and socioeconomic policies. So, too, Hawkins' outspoken style ran afoul of the public, the state's political leadership, and some of the Commissioners. His tenure in politics opened the opportunity for criticism.
He was not part of the new guard.
Hawkins testified that there was no tension between him and the Commission. This was not consistent with the balance of the trial evidence and the Court gave it less weight than the rest of his testimony. He denied that any of the earlier Commission meetings had become contentious. He attested to his good working and professional relationship with Commissioner Callahan. While the Court accepts as true and factual that Hawkins and the Commissioners were able to conduct themselves professionally and courteously in the pursuit of Lottery business, the Court finds that there was, indeed, tension between Hawkins and several of the Commissioners. The minutes of the meetings provide circumstantial evidence consistent with the various Commissioners' testimony that the meetings at times turned contentious and that relations between Hawkins and some of the members were sometimes strained.
Hawkins testified that Donald Wyatt felt it was his job to have Hawkins removed as executive director. The evidence is that Michael DeBatt was concerned about the operating procedures of the Lottery and wanted to institute rules to which Hawkins objected. DeBatt was also upset about the much publicized trip to Bangor. There was other trial evidence of the tension between Hawkins and the Commission. To the extent that the plaintiffs attempt to paint the picture that all was well between Hawkins and the Commission, the evidence belies that. The Court finds as a matter of fact that there was a large degree of tension running between Hawkins and at least some of the Commissioners.
Hawkins testified that Senator Kelly attempted to facilitate or encourage Hawkins' retirement. This was more evidence that Kelly attempted to persuade the Governor to let up on the public pressure he was exerting. Hawkins also testified that the Governor's chief of staff called him and asked him to resign stating that the Governor had the votes. Hawkins also spoke with George Caruolo, the House Majority Leader, about the question. This was consistent with the other evidence that the state's political leadership was involved in the debate over Hawkins' termination. The Court finds that Hawkins, like his sister, kept a finger on the pulse of the political leadership for just this reason.
Hawkins testified that in the weeks leading up to his termination, the Commission had questioned him about some of the matters that had received the negative publicity. He testified that he had answered their questions satisfactorily and that they accepted his explanations. He testified that through the time of the March 18th meeting none of the Commissioners had attempted to make his termination a topic of discussion or an agenda item. Hawkins recounted the various public criticisms that had been leveled at him, explaining through his testimony why the negative media attention was ill-founded. He stressed that the Commissioners accepted his explanations at the time and that there was no move afoot to terminate him-or at least not among the Commissioners. Hawkins testified that it was not until March 22nd when he spoke with the other two Commission appointing authorities, Harwood and the Governor's chief of staff, that he believed anything to be amiss. The Court accepts all of this as true and factual. It is consistent with the balance of the evidence.
Hawkins testified about the various things over which he had drawn public criticism and the inaccuracies in the media reporting. He testified that up to the meeting of March 18th his conduct and actions taken as executive director were all quite defensible. He testified that as late as the meeting of March 18th there had been no call for his resignation made by any Commissioner. This was all borne out by the balance of the evidence in the case.
Hawkins detailed the events of March 25th. His description was much the same as that of the other witnesses. He testified that the notice of the meeting was posted by the time he arrived at the Commission building later in the morning. Hawkins adamantly denied that he met with Flaherty and that Flaherty encouraged Hawkins to resign. The Court accepted this as true. Other evidence, including the testimony of Graziano, supported it.
Much of Hawkins' cross examination was devoted to the question of whether the events leading up to the meeting gave him an idea of what was to take place once the meeting was convened. The Court finds that Hawkins had indeed concluded that the question of his termination was slated to be a topic of discussion at the meeting.
Hawkins testified that he retired from State service shortly after the Lottery Commission meeting of March 25th and that he had begun to receive his state pension benefits by the end of May 1996.
Hawkins testified that his personal financial situation required him to take his retirement at that time. The Court accepted this as factual. The parties have stipulated that Hawkins retired from state service effective April 1, 1996.
 IV. Final conclusions and decision.
After considering the evidence, the Court finds as a matter of fact that the Lottery Commission was not faced with any emergency such that public notice of less than 48 hours could be justified for the meeting of March 25, 1996. The Court also finds as a matter of fact that only 3, not 5, of the Commissioners called for the meeting. The Court also finds that the notice of the meeting was not posted a minimum of 48 hours prior to the meeting. The Court decides therefore, as a matter of law, that the meeting could not properly be called as an emergency as allowed by §42-46-6(c). The Court decides that the Commission violated § 42-46-6(b) of the Act when it failed to give at least 48 hours notice to the public of the March 25th meeting.
After considering the evidence, the Court also finds that the purported notice failed to adequately apprise the public of the nature of the business to be discussed. The Court decides, therefore, that the Commission also violated § 42-46-6(b) of the Act. Section 42-46-6(b) provides that "[p]ublic bodies shall give supplemental written public notice of any meeting within a minimum of forty-eight (48) hours before the date. This notice shall include, the date the notice was posted, the date, time and place of the meeting, and a statement specifying the nature of the business to be discussed." Section 42-46-6(c) adds that "[i]f an emergency meeting is called, a meeting notice and agenda shall be posted as soon as practicable." Both of these requirements must be read in light of the purpose of the Act-"that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy." G.L. 1956 §42-46-1. Implicitly, then, one of the measures of the adequacy of a written public notice is whether it advises the citizenry such that a meaningful assessment of the desirability of their attending the meeting can be made.
Furthermore, our Supreme Court has noted in a variety of admittedly different contexts, that notice must be reasonably calculated under all the circumstances to apprise interested parties and that a mere gesture is not enough, but that the means employed must be reasonably certain to inform.
Measured against these standards, it is simply impossible for this Court to conclude that anybody could make a meaningful assessment based upon the notice posted here, which consisted of "1. Call to Order, 2. Correspondence, 3. Adjournment." The listing of the first and last items, while perhaps advisable as a matter of form, is merely perfunctory. The only substantive entry is "2.
Correspondence," which is obviously so broad in scope as to render it near meaningless to the average citizen and hence a mere gesture. And while that meaninglessness could have been avoided had a copy of the correspondence been attached and referenced in the notice or some brief indication of its contents included, neither expedient was utilized. Finally, even assuming a significant number of the populace was generally aware of the developments at the Lottery Commission, there is no notoriety exception to the notice requirements of the Act. Therefore, the Court decides that the notice at issue failed to either specify the nature of the business to be discussed or sufficiently detail the agenda.
The Court disagrees with the Commission's contention that the public notice requirements of § 42-46-6 are met if it can be proved that some members of the public could infer from the surrounding circumstances the nature of the business to be discussed by the public body notwithstanding that the written public notice is facially inadequate. As the Court has already concluded, there is no notoriety exception found in the Act and to read such an exception into the Act would run afoul of both the plain language of the statute and the public policy behind the Act.
The Court also disagrees with the Commission's contention that where a meeting is called upon legally insufficient notice in the first instance, that deficiency can be cured by simply taking the precaution of adding to the agenda the very matters the meeting was originally intended to take up. The language upon which the Commission relies merely permits a public body, convened lawfully in open session and acting in good faith and consistently with the public policy behind the Act, to add agenda items. G.L. 1956 § 42-46-6(b). To apply § 42-46-6(b) in the manner the Commission suggests would render meaningless the notice requirements of the Act.
And finally, the Court rejects the Commission's contention that the plaintiffs, by their presence at the March 25th meeting, waived their claims under the Act. The gist of the Commission's argument is that neither of the plaintiff's are "aggrieved persons" having standing to bring this suit. The Commission relies on Rhode Island zoning law cases to support their contention. The Court finds that reliance to be misplaced in that it mistakes the important public policy behind the Act and ignores the significance of the public interest to be vindicated when an action is brought pursuant to the Act. Unlike zoning matters, where the interests to be protected by the notice provisions of state-land-regulation statutes and local zoning ordinances are largely those of nearby landowners and local residents, the Act exists to protect the public at large and its interest in the maintenance of a democratic society. In zoning cases, the question is that of the claimant's opportunity to be heard, whereas the Act concerns the public's right to observe. While the concept of waiver-by-attendance may satisfy the policy behind land-use regulation, it simply does not promote the public interest that the Act is designed to serve. Often the only way the public interest can be vindicated is for a citizen to be present at a meeting, observe the violation, and bring a complaint. Furthermore, it is often only a person having a more personal interest in the actions of the public body that can realistically be expected take action under the Act. It makes no sense from a policy perspective to require members of the public to stay away from the meetings of public bodies in order that they maintain their potential status as an "aggrieved person" or to deprive the public at large of a legitimate representative simply because that representative was in attendance at the time of the violation.
After considering the evidence, the Court finds that the Commission posted only one copy of the notice for the March 25th meeting and that it was posted at the principal place of business of the Rhode Island Lottery and not at any other location within the governmental unit of the State. The Court decides that the Commission violated § 42-46-6(c).
After considering the evidence, the Court finds that the matters discussed by the Commission in executive session were not matters permitted by § 42-46-5(a). With respect thereto, the Court decides that the Commission violated § 42-46-3 and § 42-46-4.
After considering the evidence, the Court finds that there was no legitimate reason for the Commission chair not to have scheduled the meeting at issue for Tuesday, Wednesday, or later. The Court finds that by scheduling the meeting to take place within less than 48 hours, and by posting the notice of it after the close of the business day on a Friday, and by posting the notice only at a location where the public would not ordinarily be expected to visit during non-business and weekend hours, the Commission chair violated not only the technical requirements of the law but also the clearly stated public policy behind the Act. The Court finds that the number of individuals who could be expected to learn of the meeting after a last-minute posting at a place closed for the weekend is minimal and that the Commission chair knew or should have known that. Because the public policy behind the Act can be advanced only when meetings are scheduled in a timely fashion and the public advised of them early enough so that any interested citizen will have a meaningful opportunity to learn about and attend the meeting, the Court finds that the Commission chair acted in disregard for that public policy and the spirit and intent of the Act.
Based on an examination of all of the evidence, the Court finds the Commission chair's disregard for the requirements of the Act to be a matter of substantial concern. Flaherty is an attorney, a legislator, and the chair of the Commission. For him not to have a working knowledge of the requirements of the Act, and for him not to understand how he should go about carrying out its important purpose, is inexcusable.
The Court further finds that when Flaherty called the March 25th meeting and instructed Rose to schedule it he knew that notice of the meeting would be posted less than 48 hours in advance, that there was no emergency, and that fewer than 5 of the Commissioners were calling for an emergency meeting.
The Court also finds that Flaherty knew that the written notice would not disclose the nature of the business to be discussed. The Court finds that Flaherty deliberately withheld information from Rose so as to shroud the real purpose of the meeting and that he acted deliberately in leading Rose to believe that she need not contact anyone, especially the Commissioners, concerning the meeting. The Court finds that Flaherty's timing of the meeting, his denomination of the meeting as an emergency, and the manner in which he directed the public notice be written amounted to a contrivance designed to minimize the risk that there would be opposition to the motion to terminate Hawkins and to avoid a public discussion of the merits of Hawkins' termination. The Court finds that he intended to accomplish this by reducing, if not eliminating, the opportunity for the two vacationing public members of the Commission, Galleshaw and Flemming, to learn of the meeting in time to return and initiate a public debate over Hawkins' record of achievements and a discussion of the reasons for which he should or should not be fired.
The Court finds the Commission's meeting and vote of March 25th to be more than just an ill-considered and precipitous response to the demands for Hawkins' termination. The Court finds that the Commission, as a whole, and its individual members in attendance that day, sought to circumvent the requirements of the Act when they elected without discussion to continue with the meeting in the face of legal counsel's warning that they were in violation of the Act. Any Commissioner could have responded to the democratic values driving the Act by moving to table the agenda for three more days so that notice of the meeting could be properly posted and all of the Commissioners notified in accordance with the Commission's regular practice. Not one of them did. They clearly desired to vote, to vote swiftly and without loss of momentum, and to vote without discussion. To make matters worse, the question before them was one of substantial public concern considering the revenue generated by the Lottery and the social, economic, political, and legal issues surrounding gambling.
The circumstantial evidence in this case is that the Senate and House Commissioners were sensitive to the public and political pressure that had been thrust upon them. There was pressure to oust Hawkins and a looming threat that the Commission might be abolished altogether if they did not act. They believed their credibility as a Commission was deteriorating. The Court finds that the Commissioners were responding to pressure from their appointing authorities though some of them had independent reasons for believing Hawkins should go. Of course, their reasons are immaterial for instant purposes and the Court has no quarrel with the substance of the Commissioners' reasoning for why they thought Hawkins should be fired. Nonetheless, the Commissioners' first obligation was to obey the law and the strong public policy that "[i]t is essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy." Their obligation was to respond to their responsibilities as public officials governed by the Act-notwithstanding the political pressure, criticism, and public embarrassment they were enduring.
That Hawkins had become unpopular or was considered by some to represent an era of unsavory politics cannot justify the Commission's own departure from one of the fundamental principles of a democratic society.
Had the Commission aborted the March 25th meeting and reconvened in a properly noticed meeting, there would have been a greater opportunity for all of the Commissioners to be present and to join in the decision-making process. There would have been a greater opportunity for each of them to hear opposing considerations and the thoughts and opinions of the other Commissioners-including the two public members who supported Hawkins. There would have been greater opportunity for members of the public to attend the meeting and view, in person, how the Commissioners were conducting themselves with regard to a matter of substantial social, political, and economic significance. At that time, each of the Commissioners could have said nothing or each could have stated the reasons for their vote. The outcome may ultimately have been unchanged. Or, perhaps, the Commission would have voted to merely clip the wings of the goose that laid the golden egg for the Lottery-instead of killing it.
What matters, however, is that their decision-making process would have been exposed to public scrutiny and, therefore, public accountability.
The Court decides that the Commission and its members who were in attendance at the meeting of March 25, 1996, willfully violated not only the technical requirements of the Act but also the clearly stated public policy that the Act serves. The Court decides that the Commission and its members willfully circumvented the spirit and intent of the Act.
On the question of the clandestine communications or surreptitious or sequential meetings, the Court finds in favor of the Commission for the reason that the plaintiffs have failed to prove these matters by a preponderance of the evidence. The plaintiffs have failed to persuade the Court that any of the Commissioners, much less a quorum, made use of some form of clandestine communications or meetings for the purpose of discussing, considering, or acting upon the question of Hawkins' termination. The plaintiffs have also failed to persuade the Court that any of the Commissioners engaged in some form of communication for the purpose of circumventing the Act. Likewise, the Court finds that the plaintiffs have failed to prove by a preponderance of the evidence that the Governor's chief of staff Moribito acted as a conduit of information at the behest of Donald Wyatt or any of the Commissioners.
The Court finds that the plaintiffs have failed to prove by a preponderance of the evidence that the Commission convened in the functional equivalent of a meeting.
The trial evidence, both circumstantial and direct, is that Governor Almond, through the use of press releases and political inducements offered by his chief of staff, commenced a public relations war and lobbying effort against Hawkins. The plaintiffs would have the Court conclude that the Commissioners, in response to the Governor's endeavor, undertook to meet surreptitiously and in violation of the Act through the use of conduits, clandestine communications, and informal gatherings.
The plaintiffs point to the fact that there was no discussion at the March 25th meeting, the fact of the appointing authorities' relationships to each other and to the Commissioners, the opportunity for communication at the State House, the Kelly-Moribito meeting and the press conferences, the Callahan-DeBatt meeting and so on. The Court has given serious consideration to all of that evidence. It is the Court's opinion, however, that the circumstantial evidence is susceptible to more than one logical inference. The inference just as readily drawn from the evidence is that the Governor was successful in his campaign against Hawkins and that the fact that there was no discussion at the March 25th meeting merely signifies the degree of his success. This inference is consistent with the testimony of the witnesses who flatly denied any method of clandestine communications and testified that they learned of their fellow Commissioners' views on the Hawkins matter by reading the newspaper and that there was no need for discussion given the very public circumstances. After careful consideration of the evidence, the Court has concluded that only by engaging in impermissible inference building could the Court reach the conclusion plaintiffs' seek.
The plaintiffs have made much here about the Governor's conduct. While that conduct may be a disappointment to some, arguably inappropriate, unethical, or even laudable depending upon whose ox is being gored, it does not constitute a violation of the Act. The Act does not prohibit anyone, political leaders included, from lobbying, cajoling, persuading, inducing, requesting, or pressuring members of public bodies to do their bidding. Nor does the Act prohibit anyone from attempting to induce the members of a public body to commit a violation of the Act. The obligation and burden of complying with the Act are on the public body and its members alone. While the conduct of the Governor is generally relevant to the plaintiffs' claims, it is immaterial to the narrower questions before the Court. The Court decides for the plaintiffs on their claims against the Rhode Island Lottery Commission, Commissioner Frank Montanaro, Commissioner Christine Callahan, Commissioner Edward Lawrence, Commissioner Michael DeBatt, Commissioner Edward DiSandro, and Commissioner Robert Flaherty.
 V. The remedy.
The plaintiffs' seek an award of attorneys' fees as part of their remedy. Counsels' time records are in evidence. During the trial, the parties and the Court agreed that these would be admitted as evidence. The question of the reasonableness of those fees would be deferred to a post-trial evidentiary hearing should the Court determine such an award was warranted. Whether the plaintiffs are entitled to an award of attorneys' fees depends on the effect given to § 42-46-8(d), added by P.L. 1998, ch. 379, § 1.
The amendment contains no indication that it was intended to operate retrospectively. In fact, the amendment states clearly that it shall take effect upon passage and the substance of the amendments do not make retrospective application necessary by implication. In re Alicia S., No. 99-71-Appeal, slip op. (R.I., filed December 26, 2000) (per curiam); Lawrence v. Anheuser-Busch, Inc., 523 A.2d 864 (R.I. 1987); State v. Material Sand Stone Corp., 645 A.2d 492 (R.I. 1994); VanMarter v. Royal Indemnity Co., 556 A.2d 41 (R.I. 1989); Butti v. Rossi,617 A.2d 881 (R.I. 1992); Newport Yacht Management, Inc. v. Clark,567 A.2d 364 (R.I. 1989). Thus, if the language requiring the Court to award attorneys' fees amounts to a change in the substantive obligations of a public body then the plaintiffs are not entitled to such an award. Only if the change is purely remedial or procedural should the Court award attorneys' fees. Newport Yacht Management, Inc., 567 A.2d at 366. In order to determine the nature of the attorneys' fees provisions, the Court finds it necessary to consider the Act as a whole. Whether this component is one that works a substantive change upon the obligations of a public body as opposed to one that merely prescribes methods of obtaining redress ought to be considered in the overall context.
The substantive obligations imposed upon public bodies by the Act are laid out in §§ 42-46-3 to -7. Distilled, they require public bodies to follow certain technical requirements and public-policy considerations in keeping their meetings open to the public. The remedies for violation of those substantive obligations appear in § 42-46-8. From the time of the Act's adoption, citizens were permitted to file a complaint with the Department of the Attorney General and, if the Attorney General declined to pursue the matter, to hire private counsel for the purpose of filing a complaint in the Superior Court. Beyond a doubt, the latter provisions are remedial adjuncts to the substantive obligations imposed upon public bodies. The narrow question is whether the attorneys' fees provision was enacted in furtherance of a citizen's right to obtain redress for a violation of the Act's existing substantive obligations or whether it was enacted to create a new duty not previously imposed upon a public body in the context of its obligation to keep its meetings open to the public.
It is the Court's conclusion that the attorneys' fees provision is remedial and not substantive for the reason that the principal duties imposed upon a public body by the Act remain unaffected by the amendment. In Solas v. Emergency Hiring Council of the State, C.A. No. PC1997-4503 (R.I. Super., Jan. 28, 2000), Presiding Justice Rodgers ruled similarly concerning the attorneys' fees provisions of the Act. Unlike the Equal Access to Justice Act at issue in Newport Yacht Management, Inc., which conferred only one substantive benefit, that is, a litigant's right to recover attorneys' fees in administrative appeal proceedings, the amendment to the Open Meetings Act leaves unchanged both the essential obligations and duties imposed upon a public body as well as the methods by which a citizen can seek redress for violations. At best, the amendment facilitates the use of an existing method of redress by defraying the cost of engaging private counsel, which the Act has long specifically contemplated. And since the language of the Act is clear and unequivocal that the Court shall award attorneys' fees except where special circumstances would render such an award unjust, the Court decides that the plaintiffs are entitled to be compensated for the reasonable attorneys' fees and costs incurred in prevailing on their Open Meeting Act claims.
It is appropriate at this juncture to comment upon the effect of the 1998 amendment on the Act's civil penalties. The 1998 amendment to the Act increased the available civil fines from a total of $1,000.00 that could be allocated among the public body and any of its members found in willful violation of the Act to a fine of $5,000.00 that can be assessed against the public body or any of its members found in willful violation of the Act. The 1998 amendment struck the language of the earlier version that specifically capped the fine to a total of $1,000.00. Because of the qualitative and quantitative difference in what is essentially a non-remedial punitive measure, the Court concludes that this change amounts to a substantive change in the obligations of the public body and its members and that the plaintiffs, therefore, are not entitled to an award of civil fines beyond those authorized by the 1988 reenactment.
In determining the remedy to be afforded the plaintiffs, the Court is mindful of the Supreme Court's opinion in Edwards v. State of Rhode Island, 677 A.2d 1347 (R.I. 1996), in which the Court held that the remedy selected must be proportional to the breach and the effect thereof. The remedy, too, must not be rendered disproportional by its overall effect.
The Court has found that the violations surrounding the March 25th meeting were willful and undertaken in knowing disregard of the technical requirements of the Act. The Court has also found that the Commissioners intentionally violated the spirit and intent of the Act. The Court has found that their violation involved a matter of considerable public import. Given all of the facts and circumstances shown by the evidence to have existed at the time, the Court finds the Commission's conduct to be sufficiently egregious so as to warrant sanctions and penalties well beyond those permitted by the 1988 reenactment of the Act. The Court is constrained by law, however, to impose only the maximum allowable monetary fine of $1,000.00 on the Lottery Commission. That amount is to be paid forthwith.
The Court declines to allocate the $1,000.00 fine among the Commissioners and the Commission. It is an insignificant amount given the circumstances of this case and any attempt to apportion it among the Commissioners after assessing their varying degrees of culpability would serve no meaningful purpose. The Court's commentary on the Commissioners' conduct will have to suffice.
The Court finds that additional remedies as contemplated by the Act are warranted by the circumstances of this case. Specifically, the public policy objectives driving the Act require that the Commission's March 25th vote be declared null and void and of no effect. The Court finds that the Commission's action was based upon such egregious and fundamental violations of the public's right to open government that it should not be permitted to stand undisturbed. Therefore, the action of the Commission taken on March 25, 1996, when it terminated Hawkins as the executive director of the Lottery is hereby declared null and void.
In making this decision to declare the Commission's action null and void, the Court specifically declines to further exercise its equitable powers by ordering the Commission to reappoint Hawkins as executive director of the Lottery.
After the March 25th termination, Hawkins retired from state service and applied for state pension benefits. His pension was approved and he collected his first payment in the end of May 1996. It was Hawkins' testimony that he needed to do that to support himself and his family. While his retirement from state service may have been necessitated by a misfortune of circumstance, it remains a practical reality that has consequences for the remedy in this case. While the Court has the authority to declare null and void the actions of the Commission in terminating Hawkins, it does not have the authority to declare his retirement rescinded. And while the Court has the power to order the Commission to reappoint Hawkins, the Court finds that to do so would produce a result not justified by the competing equities.
The travel and history of this case has been no secret. Plaintiffs filed their original complaint on August 26, 1996, approximately 5 months after their claims arose on March 25, 1996. In doing so, they elected to join Hawkins' constitutional claims with their Open Meetings Act claims. Plaintiffs then began what the defendants not unjustifiably refer to as a "scorched earth" litigation strategy that took the parties from the Rhode Island Superior Court to the United States Federal District Court to the State of Rhode Island Personnel Appeals Board and back to the Superior Court. They repeatedly amended their complaint to add, then drop, various parties and claims. Their quest included repeated sorties directed at the state's political leaders and was brought over, among other things, the ill-conceived notion that a meeting of the Commissioners' appointing authorities amounted to a de facto meeting of the Commission or its functional equivalent. It was that legal theory that helped spawn the contest over the legislative- and executive-privilege questions and led the Supreme Court of the State of Rhode Island to intervene to stay the proceedings. Any hope that this case would be disposed of in a timely fashion or administered in accordance with the administrative order promulgated by the Presiding Justice of this Court, Administrative Order No. 95-9, dissolved early in the game. And, while plaintiffs have prevailed on their Open Meetings Act claim generally, their contention that the Commissioners engaged in clandestine communications has proved to be unfounded and ultimately unnecessary for the purpose of achieving the relief they have sought.
The Court has considered and weighed a number of factors in determining whether it should order Hawkins reappointed. Those factors include the length of time that he has been away from his duties as the executive director, the ease with which the Commission could terminate him should he be ordered reappointed, and the fact that the Commission has been free all along to reappoint him if it had so desired. The Court finds there is no utility in forcing the Commission to engage in the exercise of reappointing Hawkins given how readily it could lawfully terminate him. It has already been determined by this Court that Hawkins has no legally protected interest in the job of executive director.
Even if the Court could overlook the fact of Hawkins' retirement and had the authority to regard his status as executive director to be intact, the effect of that remedy on the Lottery and the citizenry would be disproportional given Hawkins' shared responsibility in delaying justice in this case, given the ease with which the Commission could lawfully vote to terminate him, and given the costs associated with paying him some 5 years in back wages and benefits, which even if measured as the difference between what he has received from his pension and what he would have received as executive director could amount to several hundred thousand dollars.
The Court hereby declares that Hawkins was employed as the executive director of the Lottery until the date upon which he formally retired from state service, that is, until April 1, 1996. Plaintiffs request for injunctive relief ordering Hawkins reinstated as the executive director for the Rhode Island Lottery is denied and dismissed.
The Court finds it advisable to order mandatory injunctive relief concerning one issue, however. The Lottery Commission is permanently restrained and enjoined from denying the authority of Gerald Aubin or Ray Grimes to act on behalf of the Rhode Island Lottery as its executive director or acting executive director. All acts taken by either in their capacities as executive director or acting executive director and previously ratified by the Commission are hereby affirmed.